In the
United States Court of Appeals
For the Seventh Circuit

No. 99-3883

FAYE M. OEST,

Plaintiff-Appellant,

v.

ILLINOIS DEPARTMENT OF
CORRECTIONS,

Defendant-Appellee.

Appeal from the United States District Court
for the Central District of Illinois.
No. 97 C 1339--Joe Billy McDade, Chief Judge.

Argued September 18, 2000--Decided February 14, 2001

Before EASTERBROOK, RIPPLE and WILLIAMS, Circuit Judges.

RIPPLE, Circuit Judge.  Faye Oest worked as a correctional officer for the Illinois Department of Corrections ("Department") until she was discharged under the Department's progressive discipline system. In this action, she alleges that the Department violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. sec. 2000e et seq., when it (1) discriminated against her on the basis of sex and (2) discharged her in retaliation for her earlier filing of a charge with the Equal Employment Opportunity Commission ("EEOC"). The district court granted summary judgment for the Department. For the reasons set forth in the following opinion, we affirm the judgment of the district court.

I

BACKGROUND

A.

Ms. Oest began working for the Department as a correctional officer in January 1992. She was employed at the Hanna City Work Camp in Hanna City, Illinois, until her discharge for cause in November 1995, effective January 1996.

All correctional officers are supervised by lieutenants and, above them, captains.

Lieutenants Pelphrey and Holley always supervised Ms. Oest; the supervising captain varied. Captain Reynolds, in his role as internal affairs officer, conducted many of the investigations into Ms. Oest's alleged misconduct, as well as supervised her during her probationary period when she first began her employment with the Department. In this latter role, he conducted her final probationary evaluation and recommended that Ms. Oest not be certified as a correctional officer, the first time he ever had made such a recommendation. He found problematic Ms. Oest's attendance, her miscounts of inmates, and her difficulty relating to and following the orders of Department staff. The warden's office, however, instructed Captain Reynolds to remove his negative conclusion from Ms. Oest's evaluation.

B.

The Department utilizes a progressive system of discipline under which management employs various measures of correction and discipline as infractions accrue. The process starts with lesser measures, such as oral or written reprimands; additional violations precipitate suspensions and eventually termination.

During her period of employment at the camp, Ms. Oest consistently received negative performance evaluations. She also was given many reprimands and suspensions for violating the Department's standards of conduct. Keeping in mind the importance of the temporal relationship of the various events in Ms. Oest's employment history, we shall chronicle the principal incidents leading to Ms. Oest's discharge.

1. Events prior to filing of EEOC charge

In June 1992, Ms. Oest gave a co-worker an oversized condom as a "joke" and later received a written reprimand from Captain Reynolds for this action. During the same period, in July 1992, Captain Reynolds gave her an oral reprimand for miscounting inmates. Ms. Oest was also required in July to account for the number of sick days she had used, even though she had a doctor's statement for all but one of the days taken.

In January 1993, Ms. Oest received counseling after Lieutenant Pelphrey wrote her up for failing to confiscate a visitor's car keys. Ms. Oest contends that the visitor did not have the keys in her possession when she was searched. In May 1993, Captain Roach asked Ms. Oest to have an inmate redo a cleaning assignment that she had

supervised, a request apparently not given to other correctional officers.

Ms. Oest was next referred for discipline by Lieutenant Pelphrey in November 1993 for failing to present on a timely basis a slip from her physician concerning a medical restriction. Ms. Oest claims that she received a one-day suspension for the infraction, although Department records indicate that only a written reprimand was dispensed.

In January 1994, Ms. Oest received a three-day suspension for allegedly ignoring a request in December 1993 to search a female visitor. Ms. Oest was referred for discipline after Officer Barclay, a co-worker, reported that she had refused Lieutenant Holley's order to search the visitor./1 Ms. Oest maintains that she did not disobey an order to search nor was she ever given a direct order to do so.

On January 24, 1994,/2 Ms. Oest requested a four-hour "turnaround," a request at the beginning of a shift to substitute accrued sick days or other time off for a scheduled work period. The request is usually, but not always, granted if ten other officers are available. Although other officers were present on the day in question, Lieutenant Pelphrey denied Ms. Oest's request. Ms. Oest did, however, receive turnarounds on other occasions.

Ms. Oest also submits that various officers repeatedly requested to see her badge; she received, on numerous occasions, counseling sessions for not displaying the badge on her coat. Her male counterparts, she claims, were not similarly disciplined when they omitted their badges from their work attire. Ms. Oest also alleges that she, but not others, was repeatedly asked if she had the proper number of stripes on her coat. Yet some evidence exists that these types of queries often occurred at role call, when the supervisors could not see the shorter Ms. Oest standing behind taller correctional officers.

Ms. Oest also alleges other instances of discriminatory treatment. She contends that she was often criticized for initiating assignments without consulting her supervisors. At other times, she was reprimanded for lack of initiative and for asking too many questions. Ms. Oest also mentions that she was once required to search inmates in the rain. The record indicates, however, that Ms. Oest was responsible for watching the camp's main gate that day; conducting the search outside permitted her to watch the gate at the same time. Further, a male

officer similarly had been ordered to search inmates in the rain. Ms. Oest claims that Lieutenant Pelphrey once asked her how many inmates she had shaken down and that he became "violently upset" when she responded that she would have kept count if he had requested it. R.31, Oest Dep. at 86. To her knowledge, no male officers were asked the same question.

Ms. Oest took a leave of absence from March until July 1994. During this period, on June 21, 1994, she filed a charge with the EEOC, alleging that the Department had discriminated against her because of her sex.

### 2. Events after filing of EEOC charge

a.

Lieutenant Sisson, an internal affairs investigator, was assigned to investigate Ms. Oest's EEOC complaint. He interviewed Captain Reynolds and Lieutenants Holley and Pelphrey, among others, in December 1994. In those meetings, Lieutenants Holley and Pelphrey expressed concern that the Department's employee review board had not sufficiently considered the disciplinary referrals they had submitted regarding Ms. Oest. Lieutenant Sisson responded that better "documentation" would provide the board with the necessary information to assess the recommendations. R.31, Sisson Dep. at 46. He noted that their referral packages to the board often omitted relevant information, testimony, or evidence. Lieutenant Sisson suggested, therefore, that Lieutenants Holley and Pelphrey submit more complete reports in the future to remedy these "shortcomings in procedure." Id. at 42.

During this period, two of the lieutenants wrote letters to the internal affairs division in which they set forth their views on Ms. Oest's performance. Lieutenant Pelphrey wrote a letter in late 1994 or early 1995 in which he alleged that Ms. Oest showed signs of mental instability and was "stalking" her supervisors. R.31, Ex.C at 2. Lieutenant Pelphrey wrote that the "environment that this employee [Ms. Oest] creates is nothing less than frightening." Id. In that letter, Lieutenant Pelphrey also describes a meeting that took place on October 27, 1994, at which Lieutenant Holley stated that Lieutenant Pelphrey and he "could not effectively supervise [Ms. Oest] under the constant threat of legal action." R.31, Ex.C at 1. According to Lieutenant Pelphrey's letter, that statement was "followed by either she goes or we go." Id. Lieutenant Holley also authored a memo to internal affairs in early January 1995. He questioned whether Ms.

Oest had passed her agility test and wrote that the supervisors' "authority and supervisory skills have been emasculated by upper management." R.31, Ex.D at 2.

b.

Subsequent to Ms. Oest's filing of the EEOC complaint, she was written up for various minor infractions, but at least two of those reports were withdrawn. In February 1995, Captain Gossett wrote up Ms. Oest for insufficiently cleaning a van, an infraction for which she received a three-day suspension in March. Ms. Oest claims, however, that the vehicle did not need further cleaning.

Ms. Oest's step increase was withheld for failure to meet Department objectives on April 1, 1995, and she took various leaves of absence from April to July 1995.

Lieutenant Pelphrey issued Ms. Oest a written reprimand in September 1995 for redoing a roster on her personal computer at home in contravention of policy prohibiting the removal of confidential information from the work site. She received a seven-day suspension. According to Ms. Oest, Captain Gossett knew she was redoing the roster and had given her permission to do so.

Also in September 1995, Ms. Oest was referred for discipline by Lieutenant Pelphrey and Captain Ward; in October, she was issued a ten-day suspension for permitting the unauthorized movement of an inmate.

Three additional events occurred, in close succession, immediately prior to Ms. Oest's termination. First, in September 1995, she was charged with telling inmate Manuel Cruz as he exited the shower that he had "nice[-]looking legs." R.31, Ex.A. Although Ms. Oest denies that she made the statement, she received a thirty-day suspension after Captain Reynolds initiated an internal affairs investigation. Captain Reynolds had received an inmate request slip detailing the alleged incident, investigated it, and then referred the matter for an employee review hearing after consulting with a superior officer. Curiously, however, Officer Barclay filled out the request slip, forging Cruz's name instead of signing his own, in contravention of Department policy. Officer Barclay was not disciplined for this action; although Captain Reynolds had heard rumors that Cruz had not authored the request slip, Captain Reynolds did not discover until "years after the fact" that Barclay had submitted it instead of Cruz. R.31, Reynolds Dep. at 64.

Next, Ms. Oest, in violation of Department

rules, commented in October 1995 to fellow staff and inmates about a disciplinary matter involving her husband. (Ms. Oest's husband is also a correctional officer at the same facility.) Captain Reynolds issued her a written reprimand, and, following an employee review hearing, the hearing officer concluded that progressive discipline should be imposed.

It was further alleged that Ms. Oest, in violation of a direct order, discussed with Cruz the investigation into her "nice[-]looking legs" comment in late October 1995. More specifically, she allegedly showed Cruz reports and asked him to change his statement. Ms. Oest admits she spoke with Cruz twice but denies that she was ordered not to talk to him. After an investigation--prompted by an incident report submitted by Lieutenant Pelphrey-- Captain Reynolds recommended that Ms. Oest be referred for an employee review hearing, a decision he made in conjunction with the Department's superintendent and assistant warden. Ms. Oest's thirty-day suspension for the comment was changed to a thirty-day suspension pending discharge. Ms. Oest was discharged for cause on November 5, 1995, effective January 11, 1996, pursuant to the Department's progressive disciplinary policy.

Ms. Oest received a right to sue letter from the EEOC on July 11, 1997. She filed the complaint at issue in this appeal on September 26, 1997.

II

DISCUSSION

A.   Standard of Review

We review de novo the district court's decision to grant summary judgment to the Department. See Bellaver v. Quanex Corp., 200 F.3d 485, 491 (7th Cir. 2000). Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The burden on the moving party may be discharged by demonstrating "that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). Because the primary purpose of summary judgment is to isolate and dispose of factually unsupported claims, the nonmovant may not rest on the pleadings but must respond, with affidavits or otherwise, "set[ting] forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).

Factual disputes are "material" only when they "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). Thus, if the nonmoving party fails to make a sufficient showing on an essential element of her case, the moving party is entitled to judgment as a matter of law because "a complete failure of proof concerning an essential element of the [nonmovant's] case necessarily renders all other facts immaterial." Celotex, 477 U.S. at 323. Factual disputes are "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the [nonmovant]." Liberty Lobby, 477 U.S. at 248. The evidence must create more than "'some metaphysical doubt as to the material facts.'" Johnson v. University of Wisconsin-Eau Claire, 70 F.3d 469, 477 (7th Cir. 1995) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)).

In deciding a summary judgment motion, therefore, the district court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Liberty Lobby, 477 U.S. at 251-52. It must accept as true the nonmoving party's evidence and draw all reasonable and justifiable inferences in favor of that party. See id. at 255.

In the context of this case, we must determine whether Ms. Oest presented sufficient evidence from which a reasonable jury could find that (1) she was treated less favorably than similarly situated male officers because of her sex or (2) the filing of her EEOC charge caused adverse employment actions against her.

B.  The Sex Discrimination Claim

Title VII prohibits an employer from treating an employee less favorably with respect to conditions of employment because of her sex. See 42 U.S.C. sec. 2000e-2(a)(1). To prevail on a Title VII disparate treatment claim, a plaintiff must establish that she is the victim of intentional discrimination. See Jackson v. E.B. Brach Corp., 176 F.3d 971, 982 (7th Cir. 1999).

In a Title VII action, the plaintiff may establish discrimination at the summary judgment stage through either the "direct" or "indirect" method. See Jackson, 176 F.3d at 982. We shall examine this case under both methodologies.

1.

We first examine this case under the so-called "direct" method. Under this methodology, the plaintiff must establish her case through the "thoroughly conventional" approach of "putting in enough evidence, whether direct or, more commonly, circumstantial, to create a triable issue of whether the adverse employment action . . . had a discriminatory motivation." Wallace v. SMC Pneumatics, Inc., 103 F.3d 1394, 1397 (7th Cir. 1997) (internal citation omitted). When employing the direct proof method, a Title VII plaintiff also must demonstrate that the discriminatory remark was causally related to the adverse employment action at issue. See Robin v. Espo Eng'g Corp., 200 F.3d 1081, 1089 (7th Cir. 2000).

Upon examination of the record, we believe that the district court correctly held that Ms. Oest had not provided sufficient evidence under this method to create a triable issue of fact as to whether sex was a motivating factor in the Department's decision to discipline and fire her. As we have noted, allegedly discriminatory remarks qualify as direct evidence if they are "related to the employment decision in question." Robin, 200 F.3d at 1089. In this respect, temporal proximity is often crucial to the inquiry. In Robin, for example, derogatory remarks concerning the plaintiff's age had been made two years prior to his discharge. We held, therefore, that these utterances could not be considered direct evidence of discrimination. See id. at 1089. A long time period between a remark and an adverse employment action can defeat the inference of a "causal nexus between the remark and decision to discharge." Geier v. Medtronic, Inc., 99 F.3d 238, 242 (7th Cir. 1996) (discounting evidence of bad intent that occurred a full year before the adverse action). Thus, if the remarks are not "contemporaneous with the discharge or causally related to the discharge decision making process," they are insufficient to create a triable issue of material fact regarding discrimination. Id.

We also have considered the context in which the remark was made to be a relevant factor in determining causality. In Robin, for example, the court dismissed the allegedly discriminatory remarks as "random office banter" and "conversational jabs in a social setting." 200 F.3d at 1089. Likewise in Geier, a casual comment was made during a car trip, "a setting unrelated to discussions" of the poor work performance that eventually led to the plaintiff's dismissal. 99 F.3d at 242; see also Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 724 (7th Cir. 1998) (noting that the alleged discriminatory remark occurred in a "casual

setting unrelated to discussions regarding the issues which led to plaintiff's dismissal").

In this case, Captain Reynolds remarked in January 1992 that the camp was "not the place for women to work." We do not believe that this comment fairly can be characterized as causally related to the employment action of which Ms. Oest complains. Captain Reynolds apparently made the remark in 1992, around the time that the initial decision to employ Ms. Oest was made. Although Captain Reynolds recommended that Ms. Oest not be certified after her probationary period at the camp, that conclusion was disregarded by his superiors. More importantly, the remark was made almost four years prior to Ms. Oest's termination and two years prior to her first suspension. Further, the comment was not related to the decision-making process with respect to Ms. Oest's continued status. Although Captain Reynolds did conduct the investigation into the "nice[-]looking legs" statement, he did not make the decision to terminate her employment. He merely referred the matter to the employee review board for a hearing.

Accordingly, we do not believe that Ms. Oest can sustain a charge of discrimination under the direct method.

2.

We next examine whether Ms. Oest has established a triable case under the familiar indirect or burden-shifting approach. Because employers usually are "careful not to offer smoking gun remarks indicating intentional discrimination," the burden-shifting test first elucidated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973), provides a means of evaluating indirect evidence of discrimination at the summary judgment stage. Robin, 200 F.3d at 1088.

Under the indirect method, the plaintiff must establish a prima facie case of discrimination. See McDonnell Douglas, 411 U.S. at 802; see also Bekker v. Humana Health Plan, Inc., 229 F.3d 662, 672 (7th Cir. 2000). If the employer then offers a nondiscriminatory reason for the employment action, the plaintiff must submit evidence that such an explanation is pretextual. See Bellaver, 200 F.3d at 493.

More specifically, a Title VII plaintiff establishes a prima facie case of sex discrimination by showing (1) she was a member of a protected class; (2) she was meeting her employer's legitimate business expectations; (3) she suffered an adverse employment action; and (4) the employer treated similarly situated

employees outside the class more favorably. See Simpson v. Borg-Warner Auto., Inc., 196 F.3d 873, 876 (7th Cir. 1999). If the plaintiff fails to establish this prima facie case, the employer is entitled to summary judgment without the court's even reaching the two other steps of the McDonnell Douglas analysis--the employer's articulating a legitimate, nondiscriminatory reason for its action and the plaintiff's burden to demonstrate that the purported legitimate reason was instead pretext for unlawful discrimination. See McDonnell Douglas, 411 U.S. at 802-04. Two parts of the prima facie case are at issue here./3 We shall address each in turn.

a.

Only those acts resulting in adverse employment actions are cognizable under Title VII. See, e.g., Simpson, 196 F.3d at 876. Although we have defined adverse employment actions "quite broadly," Smart v. Ball State Univ., 89 F.3d 437, 441 (7th Cir. 1996), adverse actions must be materially adverse to be actionable, meaning more than a "mere inconvenience or an alteration of job responsibilities." Crady v. Liberty Nat'l Bank & Trust Co., 993 F.2d 132, 136 (7th Cir. 1993). For example, a "materially adverse change might be indicated by a termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation." Id. We have noted, however, that "not everything that makes an employee unhappy is an actionable adverse action. Otherwise, minor and even trivial employment actions that 'an . . . employee did not like would form the basis of a discrimination suit.'" Smart, 89 F.3d at 441 (citation omitted). Because "adverse actions can come in many shapes and sizes," Knox v. State of Indiana, 93 F.3d 1327, 1334 (7th Cir. 1996), it is important to consider the particular factual details of each situation when analyzing whether an adverse action is material, see Bryson v. Chicago State Univ., 96 F.3d 912, 916 (7th Cir. 1996).

It is undisputed that Ms. Oest's suspensions and ultimate termination are adverse employment actions. Yet Ms. Oest mentions several other incidents that do not constitute adverse employment actions under our case law. For instance, Ms. Oest points to various negative performance evaluations that she received, but, in Smart, we held that unfavorable performance evaluations alone did not constitute adverse employment actions. See id. at 442; see also Silk v. City of Chicago, 194 F.3d 788, 801-03 (7th

Cir. 1999).

   Nor do we believe that the oral or written reprimands received by Ms. Oest under the Department's progressive discipline system can be considered, on this record, as implicating sufficiently "tangible job consequences" to constitute an independent basis of liability under Title VII. See Sweeney v. West, 149 F.3d 550, 556 (7th Cir. 1998) ("Absent some tangible job consequence accompanying [the] reprimands, we decline to broaden the definition of adverse employment action to include them."). With the benefit of hindsight, it can be said that, in this case, each oral or written reprimand brought Ms. Oest closer to termination. Such a course was not an inevitable consequence of every reprimand, however; job-related criticism can prompt an employee to improve her performance and thus lead to a new and more constructive employment relationship. Moreover, Ms. Oest has not pointed to any immediate consequence of the reprimands, such as ineligibility for job benefits like promotion, transfer to a favorable location, or an advantageous increase in responsibilities. Cf. Thomsen v. Romeis, 198 F.3d 1022, 1028 (7th Cir. 2000) (holding that the reprimands the plaintiff had received might not, as the plaintiff asserted, lead to future discipline and affect his ability to compete for promotions and concluding that "[t]hese consequences, considered either individually or in conjunction with each other, appear to be somewhat speculative").

   Of course, even if the negative performance evaluations or reprimands cannot, standing alone, state a claim of discrimination, they can constitute relevant evidence of discrimination with respect to other employment actions that clearly are adverse employment actions under the statute./4 See Sweeney, 149 F.3d at 556 (explaining that although negative evaluations may not constitute adverse employment actions, they could be used as evidence of discrimination under the right circumstances); see also Smart, 89 F.3d at 442./5

b.
   The district court determined that Ms. Oest had not demonstrated that she was treated any differently than a similarly situated male employee. We agree. The record does not support the conclusion that the camp officials treated her differently than a male corrections officer.

   When we turn to the various incidents about which Ms. Oest complains, we find only her own conclusory assertions that her male counterparts were treated differently. We previously have upheld the entry of summary judgment against a

Title VII plaintiff who has presented only his own uncorroborated, conclusory statements that similarly situated co-workers were treated differently. See, e.g., Bragg v. Navistar Int'l Transp. Corp., 164 F.3d 373, 377 (7th Cir. 1998); Cowan v. Glenbrook Sec. Servs., Inc., 123 F.3d 438, 446 (7th Cir. 1997).

Ms. Oest's first suspension was initiated by Lieutenant Holley when she refused to search a female visitor. At the time in question, Ms. Oest, although on her lunch break, was the only female officer available. She claims disparate treatment because Captain Roach did not discipline a male officer who had complained loudly when asked to search a visitor. Notably, however, the male officer did not refuse to undertake the search nor was the male officer the only available officer of the appropriate sex. Thus, he cannot be characterized as similarly situated to Ms. Oest.

Ms. Oest also was suspended for failing to ensure that a van was clean, for failing to comply with written orders regarding confidential information taken home, and for allowing the unauthorized movement of an inmate. With respect to the cleaning of the van and the unauthorized movement of an inmate, Ms. Oest has offered no evidence that any male officer had committed a similar infraction. With respect to the order not to bring confidential material home, the best she can do is claim that a male officer had committed an infraction similar to the misuse of confidential material but was not disciplined. This occurrence, however, is not within Ms. Oest's personal knowledge and thus, as the district court noted, cannot satisfy her evidentiary burden.

Ms. Oest's other bases of comparison suffer from similar infirmities. For example, she maintains that she was reprimanded for the condom incident while male officers who made sexual jokes and brought in pornography were not disciplined. As the district court noted, however, Ms. Oest's conduct went beyond possession of a sex-related item. She had taken the item from her husband after he was ordered to remove it from the premises. It was only after Ms. Oest brought the condom back on Department grounds that she was punished. Ms. Oest was also reprimanded for working in violation of her doctor's orders. She does not, however, present any evidence that her male counterparts also worked in contravention of a physician's instructions but were not disciplined.

Further, Ms. Oest submits that she was disciplined for the failure to remove car keys

from a visitor but admits that she had been told that a male officer was similarly disciplined. She also argues that she was treated differently regarding her matter of dress; specifically, she was counseled for not having her badge on her coat. Yet Ms. Oest, again, does not present evidence that male officers were found without their badges and not disciplined.

Indeed, the same shortcomings are evident with respect to the other incidents to which Ms. Oest points as evidence of discrimination, such as the demand that she account for sick days used. Ms. Oest has offered only her own conclusory assertions, and not specific evidence, that any male officer had committed conduct similar to hers or that any similarly situated officer was treated more favorably. As we have noted, such uncorroborated generalities are insufficient to support a Title VII claim. See, e.g., Bragg, 164 F.3d at 377; Cowan, 123 F.3d at 446.

The last three disciplinary incidents that culminated in Ms. Oest's discharge--the "nice[-]looking legs" comment to the inmate, Cruz; discussion with fellow staff about her husband's review hearing; and her conversations with Cruz about the internal investigation regarding the comment--occurred within approximately one month. The district court correctly found that Ms. Oest presented no specific evidence to support her conclusory assertion that male officers routinely discussed disciplinary incidents without being disciplined. She also failed to show that any male officer had been accused of making a sexual comment to an inmate or of discussing the resulting internal investigation with that inmate. Ms. Oest compares herself to other staff members who spoke with Cruz, but these officers were not similarly situated because they were not accused of making an inappropriate comment to him. In short, there is no specific evidence that any male officer had been accused of similar infractions; there certainly is no evidence that any male officer had committed three such infractions in an analogously short period of time and yet had escaped discipline.

C.  The Retaliation Claim

The district court also entered summary judgment for the Department on Ms. Oest's retaliatory discharge claim. It held that Ms. Oest had failed to prove a causal connection between her EEOC complaint and her termination. The court found dispositive the time lapses that had occurred between the filing of the complaint and the adverse employment actions. Specifically, more than a year passed between the filing of the complaint and Ms. Oest's discharge.

Ms. Oest nevertheless contends that the requisite causal link was established. She points out that, following the lodging of her EEOC complaint, her supervisors wrote letters to the Department's internal affairs group intimating that she had made spurious claims in the past./6 Ms. Oest also notes that she was disciplined for failing to clean a Department van approximately one month after the supervisors' letters were submitted. Thus, although some time passed between filing the complaint and the allegedly retaliatory acts, a very short lapse occurred among Lieutenant Sisson's interviews with Ms. Oest's supervisors, the letters to internal affairs, and Ms. Oest's next disciplinary referral./7

Title VII prohibits employers from retaliating against employees who contest allegedly discriminatory acts. See 42 U.S.C. sec. 2000e-3(a). A prima facie case of retaliation is established when a plaintiff shows that (1) she engaged in protected activity under Title VII; (2) she suffered an adverse employment action subsequent to her participation; and (3) there exists a causal connection between the adverse employment action and her participation in protected activity. See Smart, 89 F.3d at 440.

In evaluating claims such as this one, we have relied heavily on temporal proximity when analyzing retaliation claims; specifically, a "substantial time lapse . . . is counter-evidence of any causal connection." Johnson, 70 F.3d at 480. We also have held, however, that "[s]peculation based on suspicious timing alone" does not support a reasonable inference of retaliation; a causal link, again, is required. Sauzek v. Exxon Coal USA, Inc., 202 F.3d 913, 918 (7th Cir. 2000). A mechanistically applied time frame would ill serve our obligation to be faithful to the legislative purpose of Title VII. The facts and circumstances of each case necessarily must be evaluated to determine whether an interval is too long to permit a jury to determine rationally that an adverse employment action is linked to an employee's earlier complaint./8 The inference of causation weakens as the time between the protected expression and the adverse action increases, and then "additional proof of a causal nexus is necessary." Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 511 (7th Cir. 1998). Thus, we have permitted retaliation charges to proceed in the face of long intervals only when additional circumstances demonstrate that an employer's acts might not be legitimate. See McKenzie v. Illinois Dep't of Transp., 92 F.3d 473, 485 (7th Cir. 1996).

Under the circumstances presented here, we believe that the district court was correct in its estimation that the delay was too attenuated to support a jury verdict of retaliation. Ms. Oest filed her EEOC complaint in June 1994; the next disciplinary event, her alleged failure to clean the van, occurred eight months later in February 1995.

Ms. Oest's strongest argument is that her supervisors were engaging in a calculated effort to build a case against her. Some of the circumstances surrounding her alleged infractions warrant our careful scrutiny; for example, that Officer Barclay forged the inmate's name on the request slip; that Lieutenants Pelphrey and Holley were told to document more extensively Ms. Oest's behavior; that the supervisors were upset that their recommendations regarding Ms. Oest were being ignored; and that the same few officers had a hand in most of Ms. Oest's discipline. Also deserving of close scrutiny are Lieutenants Holley's and Pelphrey's letters suggesting that Ms. Oest's charge was undermining discipline and intimating that "either she goes or we go."

Yet none of these instances, taken alone or together, would support a jury verdict in Ms. Oest's favor on the retaliation claim. Ms. Oest offers no evidence to link the forgery of the inmate's signature on the complaint, a disturbing incident, to an argument that the underlying event--her "nice[-]looking legs" remark--did not occur. The remainder of the factors cataloged above emerged from the internal investigation of the conduct of Department officials, undertaken in the wake of Ms. Oest's filing of the EEOC charge. The investigating officer's suggestion that the officers under investigation should have kept better records is hardly evidence of retaliation. The remarks of the officers under investigation indicating that either Ms. Oest or they had to leave, although intemperate, were made in defense of the disciplinary actions that they had taken against her. A supervisor's protestation that his authority was undermined by allegations that his management practices were discriminatory does little to establish retaliation. Moreover, these remarks were not made by those responsible for deciding Ms. Oest's employment status nor is there any indication that these officers played a part in the final decision to discharge her, a decision made many months later./9 Most importantly, the discharge came only after Ms. Oest committed three additional infractions within a short time frame.

After close scrutiny of the record, we must

conclude that the district court properly determined that the evidence simply would not support a jury finding of retaliation.

Conclusion

   Accordingly, the judgment of the district court is affirmed.

AFFIRMED

FOOTNOTES

/1 Ms. Oest alleges that Officer Barclay later repudiated this statement when questioned by the union president.

/2 Ms. Oest submits in her affidavit and statement of undisputed facts that this incident occurred in January 1994. In her deposition, however, the date is listed as November 1994.

/3 The district court correctly held that the second prong, meeting the employer's legitimate business expectations, was not necessary to the analysis; the people judging Ms. Oest's performance were the same she accused of discriminating against her. See Flores v. Preferred Technical Group, 182 F.3d 512, 515 (7th Cir. 1999) (noting that courts must apply the McDonnell Douglas test flexibly; when an employee concedes that she was not meeting her employer's expectations but claims that she was treated more harshly than other rule-breakers, it makes "little sense in this context to discuss whether she was meeting her employer's reasonable expectations").

/4 Similar principles permit time-barred claims to be considered as evidence of other discrimination. Specifically, although matters that are not the subject of a complaint filed within the prescribed time limit are not actionable in themselves, they can constitute relevant evidence of discrimination with respect to other actions for which a complaint was brought within the applicable time limitation. See Mathewson v. National Automatic Tool Co., 807 F.2d 87, 91 (7th Cir. 1986) ("[E]vidence of earlier discriminatory conduct by an employer that is time-barred is nevertheless entirely appropriate evidence to help prove a timely claim based on subsequent discriminatory conduct by the employer."); see also Kusak v. Ameritech Info. Sys., Inc., 80 F.3d 199, 202 (7th Cir. 1996) (same).

   Therefore, even those instances that the Department claims to be time-barred (an issue we need not decide) could be relevant evidence of discriminatory intent with respect to the other

actions that clearly are not time-barred.

/5 Ms. Oest contends that the denial of her turnaround request is evidence of discrimination. We do not believe that this rather routine scheduling issue can be considered an adverse employment action, especially since her request was granted on other occasions. In any event, we note that, depending on the number of other officers working on a particular day, male officers similarly did not always receive the turnarounds they requested.
/6 Lieutenant Sisson, the officer conducting the investigation of Ms. Oest's allegations, at one point in his deposition made the following statement: "I would say that in some of our conversations she has displayed some--some less-than-ladylike outbursts, but nothing that I would consider inappropriate." R.31, Sisson Dep. at 50.

Read in context, we think it would be difficult to attribute gender bias to this particular remark. It is not clear, moreover, that Lieutenant Sisson made this remark to anyone in the Department. In any event, he was not the individual responsible for the decision to discharge Ms. Oest. Nor has Ms. Oest demonstrated that such a remark is an indication of bias in Lieutenant Sisson's internal investigation report or that the report influenced the decision-maker.

/7 Lieutenant Sisson's investigation took place in December 1994, the letters to internal affairs were written around December 1994 and January 1995, and Ms. Oest was disciplined in February 1995 for insufficiently cleaning a Department van.

/8 A one-year lapse between the protected expression and the employee's termination, standing alone, has been determined to be too attenuated to raise an inference of discrimination. See Paluck v. Gooding Rubber Co., 221 F.3d 1003, 1010 (7th Cir. 2000). Intervals of three months, see Sauzek v. Exxon Coal USA, Inc., 202 F.3d 913, 918-19 (7th Cir. 2000); four months, see Filipovic v. K&R Express Sys., Inc., 176 F.3d 390, 399 (7th Cir. 1999); five months, see Davidson v. Midelfort Clinic, Ltd., 133 F.3d 499, 511 (7th Cir. 1998); nearly six months, see Juarez v. Ameritech Mobile Communications, Inc., 957 F.2d 317, 321 (7th Cir. 1992); and eight months, see Adusumilli v. City of Chicago, 164 F.3d 353, 363 (7th Cir. 1998), similarly have been determined to be too long to support an inference of retaliation.

/9 Although the officers participated in the reporting and investigating of the principal events leading to Ms. Oest's discharge, their role apparently was limited to referring the

matters to the employee review board. The hearing officer made the ultimate decision to discharge Ms. Oest.

Williams, Circuit Judge, dissenting in part. I concur in the majority's conclusion that Oest has not provided sufficient direct or circumstantial evidence to support her claim of discrimination. I also agree with the majority that, with respect to Oest's retaliation claim, the eight-month time lapse between the June 1994 EEOC complaint and the alleged retaliatory actions by the Department is insufficient by itself to support a causal link. However, Oest points to other evidence that, together with the reasonable inferences that may be drawn from the evidence, is in my judgment sufficient to raise a jury question on the issue of causation.

Oest's theory of causation focuses on the time lapse between her supervisors' discussion about her EEOC complaint with an internal affairs investigator, and the beginning of the retaliatory actions she alleges. The interview between Lieutenants Pelphrey and Holley and the internal affairs investigator occurred in December 1994. Within days of that interview, Pelphrey and Holley authored letters critical of Oest. Less than a month after the letters, Oest was disciplined for the van incident. Further incidents of discipline followed, which, after Oest took time off in the summer, continued up through the time of her discharge.

Oest's theory of causation depends on two assumptions: (1) that Pelphrey, Holley, and her other supervisors first learned of Oest's EEOC claim when they were interviewed by the internal affairs investigator; and (2) that the supervisor who first disciplined her after she filed her EEOC claim knew she had filed the claim despite the fact that he was not interviewed by internal affairs./1 Still, there is no evidence contradicting these assumptions, and for summary judgment purposes, Oest is entitled to favorable inferences on both of these points.

Because I think that Oest has provided sufficient evidence that would allow a reasonable jury to find in her favor on the issue of whether the 1995 incidents were causally connected to her protected expression, I would Reverse the court's grant of summary judgment on Oest's retaliation claim and Remand for further proceedings, and to that extent, I respectfully dissent.

FOOTNOTE

/1 The timing of her supervisors' knowledge of Oest's EEOC complaint is important because her suspensions and discharge are a product of incidents reported by her supervisors, even if they did not have final say on the discipline imposed.