# Illinois Official Reports

## Appellate Court

---

### *Flick v. Southern Illinois Healthcare, NFP*, 2014 IL App (5th) 130319

---

| | |
|---|---|
| Appellate Court Caption | CINDY FLICK, Plaintiff-Appellant, v. SOUTHERN ILLINOIS HEALTHCARE, NFP, d/b/a Southern Illinois Hospital Services, Inc., Defendant-Appellee. |
| District & No. | Fifth District<br>Docket No. 5-13-0319 |
| Filed | November 5, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In plaintiff's action for retaliatory discharge, the appellate court affirmed the entry of summary judgment for defendant hospital on the ground that plaintiff failed to establish a causal connection between her report of concerns about quality control failures in one of the hospital laboratories she oversaw in her role as director of laboratories and her termination, since the termination occurred two years after the report of the quality control failures and that period was sufficient to preclude any causal connection, especially when plaintiff was an at-will employee who could have been terminated at any time, and plaintiff did not present any evidence supporting her claim that her termination was delayed due to the sensitive nature of the report, and as an alternative, a two-year campaign of retaliatory actions was waged before she was actually terminated. |
| Decision Under Review | Appeal from the Circuit Court of Jackson County, No. 06-L-8; the Hon. Christy Solverson, Judge, presiding. |
| Judgment | Affirmed. |

Counsel on
Appeal

L. Douglas Gill, of Hughes Law Firm, of Carbondale, for appellant.

Shari R. Rhode, of Rhode & Jackson, P.C., of Carbondale, for appellee.

Panel

JUSTICE CHAPMAN delivered the judgment of the court, with opinion.
Justices Goldenhersh and Cates concurred in the judgment and opinion.

## OPINION

¶ 1    The plaintiff, Cindy Flick, worked for the defendant, Southern Illinois Healthcare, NFP, as the director of its medical laboratories. Shortly after raising concerns about one laboratory's compliance with federal regulations, the plaintiff was presented with a severance agreement. She chose not to resign, and her supervisor did not terminate her employment at that time. Two years later, however, the plaintiff was again presented with a severance agreement. This time, she was terminated after refusing to accept the agreement. The plaintiff filed a suit alleging retaliatory discharge. The court granted the defendant's motion for summary judgment, finding that the plaintiff failed to present any evidence to establish a causal connection between her raising concerns and her termination. The primary basis for the court's ruling was a gap of nearly two years between the time she raised those concerns and the time she was fired. The plaintiff appeals, arguing that genuine issues of material fact remained regarding the causation issue. We affirm.

¶ 2    The defendant operates three hospitals in southern Illinois. The plaintiff was hired as the manager of the medical laboratory at one of those hospitals in 2000. In 2001, she was promoted to the position of director of laboratories. In her deposition, the plaintiff explained that she approached her supervisor, Memorial Hospital administrator George Maroney, and suggested ways to consolidate some of the functions of the three labs that would make their operation more efficient. Maroney told her to write up a job description for a new position which would be responsible for implementing the plaintiff's suggestions for consolidation. She did so, and Maroney promoted her to the new position. This promotion came with a "substantial" pay increase.

¶ 3    In her role as director of laboratories, the plaintiff continued to manage the laboratory at Memorial Hospital; in addition, she oversaw some of the functions of the laboratories at the defendant's other hospitals–Herrin and St. Joseph. However, she did not have direct supervisory authority over the employees of the Herrin and St. Joseph labs; instead, she oversaw their operations in what she described as a "consulting role." As a result of the consolidations of operations the plaintiff recommended, the responsibility and authority of the lab managers at Herrin Hospital and St. Joseph Hospital decreased.

¶ 4    In July 2003, the plaintiff discovered quality control failures in the chemistry department at Herrin Hospital's lab. According to the plaintiff, this situation amounted to a violation of the federal Clinical Laboratory Improvement Amendments of 1988 (CLIA) (42 U.S.C. § 263a *et seq*. (2000)). She reported her concerns to Dr. Padmalatha, the medical director of the Herrin Hospital lab, and Al Green, the manager of the lab. In August 2003, she presented a corrective action plan to Green to address the quality control issues. The plaintiff did not believe Green was taking appropriate actions to fix the problem. Therefore, she presented her concerns to Maroney and Rebecca Ashton, the administrator of Herrin Hospital, who was Green's direct supervisor. According to the plaintiff, she discussed the matter with Dr. Padmalatha, who agreed that corrective measures needed to be taken.

¶ 5    On November 10, 2003, Maroney called the plaintiff into his office. He told her that her management style was not conducive to a long-term relationship with the hospital and presented her with a severance agreement. Two days later, on November 12, the plaintiff called the defendant's compliance help line to report her concerns regarding possible CLIA violations in the Herrin Hospital laboratory. On November 18, the plaintiff once again met with Maroney. She told him that she did not wish to accept the severance agreement. Maroney did not terminate the plaintiff's employment at this time; however, he did limit her responsibilities as director of laboratories. Specifically, he told her that she was to have no role in the operation of the Herrin Hospital lab. According to the defendant, Maroney told the plaintiff that as a result of this limit on her responsibilities, the plaintiff's salary would be frozen and she would be ineligible for annual raises. This was because the salary increase she received when she was promoted to director of laboratories was based on her oversight of all three labs.

¶ 6    As a result of the plaintiff's call to the compliance help line, compliance officer Christie Connelly conducted an investigation of her claims. Connelly found no CLIA violations, but did find violations of the defendant's own internal policies, for which corrective measures were necessary. Connelly's report was issued in May 2004.

¶ 7    In the fall of 2004, the defendant began the process of converting to a new computer system, called Meditech. The first department scheduled to make the conversion was the labs. The plaintiff, as Memorial Hospital's lab manager, was responsible for seeing that lab personnel did all they needed to do to make the transition to the new system smoothly. This included scheduling training and testing sessions.

¶ 8    The labs switched to the Meditech system in September 2005. The transition did not go smoothly, and the lab at Memorial Hospital encountered significantly more problems than the labs at Herrin and St. Joseph. According to the defendant's vice president of information technology, most of the problems could have been avoided had the Memorial lab employees spent more time testing the system before the conversion.

¶ 9    On October 12, 2005, Maroney once again offered the plaintiff a severance package. She again declined. This time, Maroney terminated her employment. He told her that the reason for her termination was her role in the problems with the conversion to the Meditech system.

¶ 10    In February 2006, the plaintiff filed a petition alleging that she was discharged in retaliation for reporting possible violations of CLIA. In an amended complaint, she alleged, "After the attempt to terminate plaintiff's employment in November 2003, plaintiff experienced a hostile and retaliatory work environment." As an example, she alleged that prior to November 2003, her performance reviews were all favorable and she received annual

pay increases, but after the "attempt to terminate" her employment, she received "much less favorable" evaluations and no pay raises. She further alleged that she was told the reason for her termination was problems with the switch to Meditech even though she had a limited role in the conversion to that system. She alleged that staffing shortages made it difficult for her to schedule sufficient training and testing sessions for her employees.

¶ 11    In a deposition, the plaintiff acknowledged that her employment with the defendant was at will. Asked if she was aware of any complaints regarding her management style prior to November 2003, she replied that Maroney told her, "Slow down, you know, you're moving too fast, too many changes." She further testified that she was not aware of any other specific complaints about her management style. She acknowledged, however, that Dr. Padmalatha provided a February 2003 performance evaluation of the plaintiff in which she noted that the plaintiff was too quick to make changes and did not discipline employees equally. The plaintiff further acknowledged that Dr. Padmalatha raised similar concerns in 2005.

¶ 12    The plaintiff was asked if she took any action with regard to the quality control issues at the Herrin Hospital lab after January 2004. She stated that she may have spoken to Christie Connelly, the defendant's compliance officer, a few times, but was otherwise not involved with the Herrin lab after November 2003.

¶ 13    The plaintiff was then asked to explain her belief that her termination was related to raising her concerns regarding the quality control issues at Herrin Hospital. She replied, "The circumstantial evidence of the escalating reports, the perfect evaluations prior, the poor evaluations later, the retaliatory treatment that I endured for the following two years." As examples of this retaliatory treatment, the plaintiff pointed to the freeze on her salary and a memorandum questioning her veracity, which she alleged was sent to multiple recipients.

¶ 14    The plaintiff testified that she believed that the only reason Maroney did not fire her after she declined the severance agreement in November 2003 was her report to the CLIA compliance hotline. She explained: "I can tell you–it's my assumption that that was absolutely not his decision to let me continue to work. He was told by higher-ups in the organization that *** 'This is too much of a hot potato. You do not touch it now.' " She admitted, however, that she had no evidence to support this assumption.

¶ 15    The defendant put forth evidence of specific actions on the part of the plaintiff that contributed to the problems at the Memorial Hospital lab. Specifically, the plaintiff and members of her staff attended a training session that was scheduled to take place over a period of 4½ days, but the plaintiff left after only 2 days and took the other staff members with her. The plaintiff admitted that this occurred, but stated that she attended the portions of the training session that were relevant for her. In addition, the plaintiff appointed Ryan Jones, a unit supervisor in the Memorial Hospital lab, to be the "point person" in charge of the conversion project for the lab. When Jones left to become the lab manager at St. Joseph Hospital, the plaintiff did not appoint anyone to take his place. Maroney admitted in his deposition that the plaintiff was not the only person to blame for the problems in the transition to Meditech; he also found fault with the defendant's information technology department and the vendor of the software.

¶ 16    The defendant filed a motion for summary judgment, arguing that it was entitled to judgment as a matter of law because the plaintiff presented no evidence of a causal connection between her actions in raising concerns about the Herrin Hospital lab's compliance with CLIA and her termination.

¶ 17 The court granted the motion in a detailed written order entered May 20, 2013. The court first found that the plaintiff had to demonstrate that her discharge was in retaliation for the exercise of a statutory or constitutional right and that the defendant's conduct was motivated by unlawful considerations in contravention of public policy.

¶ 18 The court found that the plaintiff exercised a statutory right when she called the defendant's CLIA compliance hotline. However, the court found that the plaintiff could not establish that her discharge was in retaliation for exercising this right because of the timing. The court explained that the plaintiff was first presented with a severance agreement *before* she called the hotline. The court then noted that the plaintiff was not fired until nearly two years after she called the hotline. The court pointed out that "numerous cases" hold that a significant gap in time breaks the causal connection a plaintiff is required to prove. See, *e.g.*, *Ramirez v. Runyon*, 971 F. Supp. 363 (C.D. Ill. 1997); *Juarez v. Ameritech Mobile Communications, Inc.*, 746 F. Supp. 798 (N.D. Ill. 1990); *Maldonado v. Metra*, 743 F. Supp. 563 (N.D. Ill. 1990). The court therefore entered judgment in favor of the defendant. This appeal followed.

¶ 19 In order to support a claim for retaliatory discharge under Illinois law, a plaintiff must demonstrate that (1) she was discharged from her job, (2) the discharge was in retaliation for her activities, and (3) the discharge violates a clearly mandated public policy of this state. *Mackie v. Vaughan Chapter–Paralyzed Veterans of America, Inc.*, 354 Ill. App. 3d 731, 734 (2004); *Stebbings v. University of Chicago*, 312 Ill. App. 3d 360, 365 (2000). The term "clearly mandated public policy" has "no precise definition." *Palmateer v. International Harvester Co.*, 85 Ill. 2d 124, 130 (1981). However, our supreme court has held that "public policy concerns what is right and just and what affects the citizens of the State collectively." *Palmateer*, 85 Ill. 2d at 130. In addition, the court has held that what is "clearly mandated" as public policy "is to be found in the State's constitution and statutes and, when they are silent, in its judicial decisions." *Palmateer*, 85 Ill. 2d at 130.

¶ 20 Claims of retaliatory discharge have been recognized in instances where an employee has been discharged in retaliation for filing a workers' compensation claim, reporting illegal or improper conduct, or refusing to work in conditions that are hazardous or violate federal safety standards. *Mackie*, 354 Ill. App. 3d at 734. Reporting illegal or improper conduct is protected regardless of whether the conduct is alleged to violate state or federal law. It is also protected regardless of whether the improper conduct is reported to authorities within the company or to outside authorities. *Stebbings*, 312 Ill. App. 3d at 372. Retaliatory discharge is an exception to the rule that an at-will employee can be discharged with or without cause. *Mackie*, 354 Ill. App. 3d at 733. As such, it is a "limited and narrow cause of action." *Mackie*, 354 Ill. App. 3d at 733-34.

¶ 21 Summary judgment is only proper where the pleadings, depositions, and affidavits in the record show that there are no genuine issues of material fact to be resolved and the moving party is entitled to judgment as a matter of law. *Thompson v. Gordon*, 241 Ill. 2d 428, 438 (2011). In determining whether genuine issues of material fact remain that would preclude summary judgment, courts must view the factual record in the light most favorable to the nonmoving party. *United National Insurance Co. v. Faure Brothers Corp.*, 409 Ill. App. 3d 711, 716 (2011). Summary judgment is a drastic remedy which is not appropriate unless the moving party's right to judgment is "clear and free from doubt." (Internal quotation marks omitted.) *United National Insurance Co.*, 409 Ill. App. 3d at 716. However, mere speculation

or conjecture is not sufficient to defeat a motion for summary judgment. *Trigsted v. Chicago Transit Authority*, 2013 IL App (1st) 122468, ¶ 49. On appeal, we review the trial court's determination *de novo*. *United National Insurance Co.*, 409 Ill. App. 3d at 716.

¶ 22   The plaintiff first argues that the court erred in finding that she did not engage in "protected activity" until she called the compliance help line to report possible CLIA violations two days after Maroney presented her with the first severance agreement. She argues that voicing her concerns about the lab's procedures prior to the meeting at which she was offered a severance agreement was also "protected activity." We agree. As previously noted, Illinois courts have specifically recognized claims of retaliatory discharge where employees have been discharged for reporting improper conduct, including violations of federal laws or regulations. *Mackie*, 354 Ill. App. 3d at 734; see also *Stebbings*, 312 Ill. App. 3d at 372. We find no meaningful distinction between the plaintiff's actions in raising the issue with Green, Maroney, and Dr. Padmalatha and her subsequent call to the compliance help line. Thus, if the plaintiff could establish that she was discharged in retaliation for raising those concerns prior to calling the help line, such a discharge would violate public policy. However, this conclusion does not help the plaintiff because we agree with the trial court and the defendant that she failed to provide any evidence of a causal connection.

¶ 23   The plaintiff argues that the court erred in finding that there were no genuine issues of material fact regarding causation based on the fact that nearly two years elapsed between her efforts to call attention to the quality control problems at Herrin Hospital and her termination. She correctly notes that causation is ordinarily a question of fact for a jury to determine. See *Vorpagel v. Maxell Corp. of America*, 333 Ill. App. 3d 51, 56 (2002) (citing *Diehl v. Polo Cooperative Ass'n*, 328 Ill. App. 3d 576, 582 (2002)). She argues that, contrary to the trial court's ruling, significant gaps in time between a plaintiff's activity and termination do not automatically defeat a claim that the termination was retaliatory. Her argument accurately states the law. See *Vorpagel*, 333 Ill. App. 3d at 57. However, to survive a motion for summary judgment, a plaintiff must present some evidence of a causal connection. For the reasons that follow, we find that the plaintiff here has failed to do so.

¶ 24   In order to understand the plaintiff's arguments, we find it useful to discuss the role that timing plays in establishing a causal connection. We note that few Illinois courts have addressed this question. As such, the trial court relied on federal decisions, and the defendant likewise cites to federal cases. Although there are differences between a common law action for retaliatory discharge under Illinois law and a statutory claim of retaliation under federal law, both causes of action require proof of a causal connection. See *Dixon Distributing Co. v. Hanover Insurance Co.*, 161 Ill. 2d 433, 443 (1994); *McKenzie v. Illinois Department of Transportation*, 92 F.3d 473, 483 (7th Cir. 1996). As such, federal cases addressing that issue are relevant and instructive.

¶ 25   Federal courts have found that a close temporal nexus between the plaintiff's protected activity and the alleged retaliation constitutes circumstantial evidence that can lead to an inference of a retaliatory motive. See, *e.g.*, *McKenzie*, 92 F.3d at 484 (finding that a plaintiff made a *prima facie* showing of a retaliatory motive where the alleged retaliatory act of her employer "occurred within days" after the plaintiff filed an administrative charge); *Wirey v. Richland Community College*, 913 F. Supp. 2d 633, 649 (C.D. Ill. 2012) (quoting *Lang v. Illinois Department of Children & Family Services*, 361 F.3d 416, 419 (7th Cir. 2004)); *Ramirez*, 971 F. Supp. at 367 (quoting *McClendon v. Indiana Sugars, Inc.*, 108 F.3d 789, 797

(7th Cir. 1997)). However, close timing is usually not enough to establish a causal connection standing alone. *Oest v. Illinois Department of Corrections*, 240 F.3d 605, 616 (7th Cir. 2001).

¶ 26    By contrast, federal courts have found that gaps of even a few months between the employee's protected activity and the employer's challenged action will generally defeat an inference of a retaliatory motive. See, *e.g*., *Leonard v. Eastern Illinois University*, 606 F.3d 428, 432 (7th Cir. 2010) (holding that a six-month gap between the plaintiff's civil rights complaint and his discharge was "too long to infer a link between the two"); *Oest*, 240 F.3d at 616 (finding a gap of eight months "too attenuated to support a jury verdict of retaliation"); *Wirey*, 913 F. Supp. 2d at 649 (finding a gap of 2½ months too long "to circumstantially establish a causal link"); *Ramirez*, 971 F. Supp. at 367 (explaining that "as the temporal distance between the two events increases, the likelihood of a casual [*sic*] link decreases"). However, even with long intervals, federal courts have allowed retaliation claims where other evidence supported the causal link. *Oest*, 240 F.3d at 616.

¶ 27    The plaintiff cites *Netzel v. United Parcel Service, Inc*., 181 Ill. App. 3d 808 (1989), in support of her contention that "the passage of time *** cannot be allowed to insulate an employer from liability for retaliatory discharge." *Netzel*, 181 Ill. App. 3d at 813. We believe her argument takes this language from *Netzel* out of context, and we find the case inapposite to the circumstances of the case before us.

¶ 28    The plaintiff in *Netzel* was a driver for United Parcel Service (UPS). He injured his knee in a work-related accident and filed a claim under the Workmen's Compensation Act. *Netzel*, 181 Ill. App. 3d at 811. The plaintiff attempted to return to work three different times, but on each occasion, he was unable to continue his route due to pain and swelling in his knee. On the day he made his third attempt to return to work, he was discharged. *Netzel*, 181 Ill. App. 3d at 811. This was more than a year after he filed his initial claim for workers' compensation benefits. *Netzel*, 181 Ill. App. 3d at 811.

¶ 29    The plaintiff filed a retaliatory discharge suit, and the jury returned a verdict in his favor. However, the trial court granted UPS's motion for a new trial, finding that there was no causal link between the plaintiff's claim for workers' compensation benefits and his discharge because he was discharged more than one year after he filed his claim. *Netzel*, 181 Ill. App. 3d at 811.

¶ 30    The appellate court reversed that ruling, finding that the jury reasonably inferred a causal link from the evidence before it. *Netzel*, 181 Ill. App. 3d at 813. First and foremost, the *Netzel* court found that "the trial court erred in focusing on the filing of the claim as the action in retaliation against which plaintiff was discharged." *Netzel*, 181 Ill. App. 3d at 813. The court explained that this was because the plaintiff's right to receive workers' compensation benefits "for as long as he was unable to work *** deserves protection." *Netzel*, 181 Ill. App. 3d at 813. It was for this reason that the court found that "the passage of time from the date of filing a claim" could not insulate UPS from liability. *Netzel*, 181 Ill. App. 3d at 813. In other words, the plaintiff in *Netzel* engaged in protected activity up to and including the day he was discharged.

¶ 31    Furthermore, the *Netzel* court found additional evidence to support the jury's verdict. The UPS manager who fired the plaintiff accused the plaintiff of feigning his injuries, which the jury could reasonably interpret as "displeasure with plaintiff's prolonged exercise of his statutory rights." *Netzel*, 181 Ill. App. 3d at 813-14. In addition, there was testimony that a

UPS driver could not be fired unless he had received " 'a lot of write-ups.' " *Netzel*, 181 Ill. App. 3d at 815. This testimony could explain why UPS did not fire the plaintiff soon after he filed his claim.

¶ 32    Here, the plaintiff began raising concerns about the quality control at the Herrin Hospital lab in July 2003. An investigation into the matter was concluded in May 2004. In her deposition, the plaintiff admitted that she "may have" discussed the alleged CLIA violations during the investigation, but she did not make any other efforts to report any violations after November 2003. In her brief, she essentially concedes that her "final action" related to the possible CLIA violations came on November 4, 2003. She was not discharged until October 2005. Thus, unlike the plaintiff in *Netzel*, the plaintiff here was not engaging in protected activity up until the date she was discharged. The gap in time was too long to support an inference of a retaliatory motive.

¶ 33    The plaintiff admits in her brief that "it would be difficult, if not impossible," for her to establish a causal connection without what she calls "the first attempt" to discharge her in November 2003. As we discussed earlier, however, there is nothing in the record to support the plaintiff's conclusory allegation that Maroney's "first attempt" to fire her was thwarted by her call to the compliance help line. Indeed, the plaintiff admitted in her deposition that she had no evidence to support her assumption. Maroney explained that he retained the plaintiff because he believed she had enough talent to fix the problems in her management style. The documentary evidence in the record bears this out. The plaintiff's performance evaluations, both before and after she voiced her concerns regarding quality control issues in the Herrin Hospital lab, consistently noted that her business and technical skills met or exceeded standards, but that her management style created problems. Specifically, her evaluations stated that she created friction by failing to keep physicians in the loop, trying to make changes too quickly, and failing to treat employees equally. The plaintiff acknowledged that both Maroney and Dr. Padmalatha raised these concerns throughout her employment.

¶ 34    The plaintiff points to what she calls evidence of a "retaliatory environment" that began when Maroney first offered her a severance agreement in November 2003 and continued for the duration of her employment. As noted, she relies heavily on the salary freeze and her performance evaluations. Neither of these things is actionable in its own right, and the plaintiff does not contend otherwise. See *Graham v. Commonwealth Edison Co.*, 318 Ill. App. 3d 736, 742 (2000) (explaining that the "tort of retaliatory discharge does not encompass any behavior other than actual termination of employment"). She does, however, argue that the treatment she received constitutes evidence of a retaliatory motive sufficient to preclude summary judgment. We disagree.

¶ 35    It is true, as the plaintiff points out, that her performance evaluations prior to November 2003 were better than the evaluations she received after that time. Although the comments on the evaluations were similar, her overall numerical scores prior to November 2003 were in the mid to upper 90s, while the numerical scores subsequently were in the low 70s. However, as we have already discussed at length, both Maroney and Dr. Padmalatha expressed concern about the plaintiff's managing style all along. In each of the evaluations Maroney prepared after November 2003, he noted that the plaintiff had made some improvement in that area, but the improvement was not sufficient. This supports Maroney's testimony that he retained

the plaintiff in 2003 because he believed she had the talent to fix her shortcomings, and the plaintiff has not provided any evidence to the contrary.

¶ 36 Significantly, the plaintiff has presented no evidence to support her theory that Maroney was prevented from discharging her in 2003 and, therefore, needed to wage a two-year campaign of retaliatory actions in order to discharge her in October 2005. She acknowledged in her deposition that her employment with the defendant was at will. Unlike the record in *Netzel*, the record here contains no evidence that the defendant had to document ongoing dissatisfaction in order to terminate her employment. In short, there is nothing in the record to explain away the fact that Maroney retained the plaintiff for a significant period of time after she voiced her concerns about possible CLIA violations and no other evidence to support an inference of a retaliatory motive. Because it was the plaintiff's burden to provide evidence of this causal link, we conclude that the court properly granted summary judgment.

¶ 37 For the foregoing reasons, we affirm the trial court's order granting summary judgment in favor of the defendant.

¶ 38 Affirmed.