# ILLINOIS OFFICIAL REPORTS

## Appellate Court

---

### *Trigsted v. Chicago Transit Authority*, 2013 IL App (1st) 122468

---

| | |
|---|---|
| Appellate Court Caption | LETICIA ZAVALA TRIGSTED, Individually and as Mother and Next Friend of Valery Trigsted, a Minor, Plaintiffs-Appellants, v. CHICAGO TRANSIT AUTHORITY, a Municipal Corporation, Defendant-Appellee. |
| District & No. | First District, Sixth Division<br>Docket No. 1-12-2468 |
| Rule 23 Order filed | June 7, 2013 |
| Rule 23 Order withdrawn | July 11, 2013 |
| Opinion filed | July 19, 2013 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | Defendant transit authority's alleged negligence in allowing the bus on which plaintiff and her daughter were riding to become overcrowded was not the proximate cause of the injuries they suffered when plaintiffs were attacked by two other passengers; therefore, the entry of summary judgment for defendant was affirmed. |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-L-12115; the Hon. Thomas J. Lipscomb, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | John F. O'Meara, of Chicago, for appellants. |
|---|---|
| | Karen G. Seimetz, Stephen Wood, and Rachel Kaplan, all of Chicago Transit Authority, of Chicago, for appellee. |
| Panel | JUSTICE GORDON delivered the judgment of the court, with opinion. Justices Hall and Reyes concurred in the judgment and opinion. |

**OPINION**

¶ 1 The instant appeal concerns the liability of defendant Chicago Transit Authority (CTA) for injuries suffered by plaintiffs Leticia Trigsted and her daughter, six-year-old Valery Trigsted, when they were attacked while riding a CTA bus. Plaintiffs filed suit against the CTA, claiming that the CTA's negligent conduct in permitting the bus to become overcrowded increased the risk of attacks by third parties. The trial court granted the CTA's motion for summary judgment, finding that the CTA was immune from liability for failure to prevent third-party criminal acts and that plaintiffs had not demonstrated that the CTA's conduct proximately caused their injuries. Plaintiffs appeal, and we affirm.

¶ 2                                  BACKGROUND
¶ 3                                 I. Complaint
¶ 4 On October 13, 2009, plaintiffs filed a complaint against the CTA alleging that, on May 27, 2009, plaintiffs boarded a westbound CTA bus at the intersection of Sacramento Boulevard and Belmont Avenue. As the bus continued on its route, it became overcrowded, especially at the intersection of Belmont and Kimball, "causing some passengers to begin pushing[,] jostling and shoving each other" as the bus continued to its stop at 3558 W. Belmont. Two specific passengers, a man and a woman, "kick[ed] and punch[ed] other passengers, including [Leticia], while hurling insults regarding national origin" and squeezed Valery between them.

¶ 5 The complaint alleges that the CTA was negligent: (a) in permitting its bus to become overcrowded, "causing some passengers to begin pushing[,] jostling and shoving each other"; (b) in permitting the two passengers to kick and punch other passengers and "hurl[ ] insults" "when the driver of the bus knew or should have known of this conduct and failed to do anything to prevent it"; and (c) in "encourag[ing] and facilitat[ing] the escape of Plaintiff's assailants before the police arrived."[1] The complaint alleges that as a result of the CTA's negligence, Leticia sustained physical injury, pain and suffering, and humiliation and that

---
[1]Subparagraph (d) alleges that the CTA "was otherwise careless and negligent."

Valery sustained "trauma, fear and humiliation which has required her to receive medical care" as a result of being squeezed between the two passengers.

¶ 6    On December 30, 2009, the CTA filed its answer and affirmative defenses, denying the allegations in plaintiffs' complaint and claiming as affirmative matter that plaintiffs were barred from recovery because their injuries were caused by their own negligence and that the amount of their comparative fault was in excess of 50%. The CTA did not make any mention of statutory immunity in its affirmative defenses.

¶ 7                      II. CTA's Motion for Summary Judgment

¶ 8    On December 20, 2011, the CTA filed a motion for summary judgment, arguing that all of plaintiffs' allegations amounted to a claim against the CTA for failing to protect plaintiffs from the criminal acts of a third party, which fell within the purview of the statutory immunity provided to the CTA by section 27 of the Metropolitan Transit Authority Act (the Act) (70 ILCS 3605/27 (West 2008)), which provides in relevant part that "[n]either the Authority, the members of its Board nor its officers or employees shall be held liable for failure to provide a security or police force or, if a security or police force is provided, for failure to provide adequate police protection or security, failure to prevent the commission of crimes by fellow passengers or other third persons or for the failure to apprehend criminals."

¶ 9    The CTA also argued that its actions were not the proximate cause of plaintiffs' injuries, but, at most, plaintiffs claimed the CTA furnished a condition that made the injury possible. Consequently, the CTA claimed that it was entitled to summary judgment.

¶ 10   Attached to the CTA's motion for summary judgment were a number of exhibits, including a DVD containing the surveillance video recording from the bus on which the incident had occurred.

¶ 11                          A. Leticia's Deposition

¶ 12   Also attached to the CTA's motion for summary judgment was the transcript of Leticia's discovery deposition, taken on April 25, 2011. Leticia testified that she moved to the United States from Mexico in 1990 and spoke fluent Spanish.

¶ 13   Leticia testified that, on May 27, 2009, she picked up her daughter Valery from school at Sacramento and Belmont and was traveling to a bank on the corner of Milwaukee and Belmont by taking the westbound route 77 CTA bus down Belmont Avenue. The bus stopped at Belmont and Kimball, across the street from a Blue Line L stop, at approximately 4 p.m. When she entered the bus, Leticia had been unable to find a seat because the bus was full, but as passengers departed the bus at Kimball, she was able to sit in a seat directly behind the rear door; Valery was sitting on Leticia's lap.

¶ 14   Leticia testified that at the Kimball stop, passengers entered the bus from both the front and rear doors. Leticia observed a CTA employee collecting fares at the rear door who permitted passengers to enter from the rear; the CTA employee did not ride the bus but remained at the stop. After people had boarded the bus at Kimball, the bus was "[p]retty

packed."

¶ 15    Two particular individuals boarded the bus through the rear door at Kimball: an African-American man, who was approximately 6 feet 2 inches and 240 pounds, and a Puerto Rican woman, who was approximately 5 feet 1 inch and 150 pounds; the woman indicated that they were married. Leticia overheard the couple "talking loud and nasty" to a Mexican man in front of them who had also boarded the bus at Kimball; the woman was calling him names in Spanish and making derogatory statements about Mexicans, and the man was making similar statements in English. The Mexican man walked away and did not respond to the verbal attack. Leticia had "[n]o idea" what prompted the couple to make the inappropriate comments to the Mexican man and testified "I don't know if he cut in front or what happened when he got in front of them"; she had observed the Mexican man walking in front of the woman at the bus stop, but did not observe him cutting in line.

¶ 16    Leticia testified that Valery became nervous and began crying in response to the bad language. Leticia asked the woman to lower her voice "and then she started going off to me." The woman began calling Leticia the same names that she was calling the Mexican man, still speaking in Spanish, and told Leticia to "go back to [her] country." Leticia asked the woman, "well, you're Spanish also. So Mexican, Puerto Rican, Spanish, right, what is the difference?" The woman responded that " '[a]t least I don't have to come to this country with [a] passport,' " and Leticia decided to leave the bus because " '[t]hat's enough.' " The man was also calling Leticia names. Leticia testified that Valery was becoming afraid, so Leticia decided to leave the bus at Central Park and Belmont, four blocks before her planned stop.

¶ 17    The woman screamed something else at Leticia, but Leticia "[did not] want to hear it" and did not respond, because she was scared and wanted to leave the bus with Valery without further incident. Leticia attempted to exit the bus through the rear door at the Central Park stop, but the couple was standing near the rear door and blocking the exit. When Leticia attempted to exit the bus, "[t]hey kind of closed–they put their legs together like to make me trip because I was taking my daughter in front. So they kind of squeezed my daughter's leg because I push[ed] her to get her off from the bus first." Leticia handed Valery to a woman outside the bus, lifting her over the couple's legs in order to exit the bus.

¶ 18    Once Valery was safely removed from the bus, Leticia attempted to step over the couple's legs, but they began pushing her. Leticia grabbed the handles on the bus door to keep her balance, and the couple began punching her in the head and back. Leticia turned to defend herself, and the man punched her in the face and kicked her in the stomach, while pushing her out of the bus. When Leticia exited the bus, she called 911. The dispatcher informed her that someone else had already called in the incident and the police were on their way.

¶ 19    While Leticia was waiting for the police, she was holding onto the bus handrail and her leg was on the bus; the bus remained in a stopped position. The couple spoke with the bus driver, and the bus driver approached Leticia and told her to remove her leg because he was already late and needed to leave. She told him that " '[n]obody is going until the police get here.' " The bus driver returned to the couple and told them that they should leave on the next bus because the police had already been called. The couple left on the next bus.

¶ 20    When an ambulance arrived, Leticia was examined by the paramedics, but she refused transportation by ambulance to the hospital because she did not have insurance to cover the ambulance and wanted to go home and take care of Valery, who was very quiet and afraid. Leticia and Valery walked approximately 10 blocks home after the incident.

¶ 21    Leticia testified that she sought medical attention at Resurrection Hospital on the day of the incident, where she informed the medical staff that she "got jumped on the bus." After an examination and X-rays, the doctor who examined her determined that her injuries consisted of bruises. She was prescribed Vicodin for pain, but only took it once, because she "didn't feel too good" after taking it. After approximately a week, Leticia made a full recovery physically, although the incident still troubled her mentally; she did not receive any mental health treatment related to the incident. Valery did not have any physical injuries, but was stressed at night and woke often and was unable to concentrate at school. Valery was treated by a therapist for her anxiety and emotional issues. Leticia opined that Valery had improved, but was attached to Leticia and still sensitive to fights or aggressive behavior; she is no longer visiting the therapist.

¶ 22    Leticia testified that she believed that the couple began physically attacking her because "I think there were too many people on the bus. Overcrowded. It was after work. Everybody is tired and nobody wants to be squeezing. I guess too many people there. I'm not sure. *** Usually when you have too many people everywhere, there's always a fight or always something."

¶ 23                            B. Valery's Deposition

¶ 24    Also attached to the CTA's motion for summary judgment was the transcript of Valery's discovery deposition, taken on April 25, 2011. Valery was eight years old at the time of the deposition, and was six years old at the time of the incident. She testified that on the day of the incident, Leticia picked her up from school and they rode a CTA bus. Initially, they were unable to find a seat on the bus, but eventually, Leticia found a seat behind the rear door and Valery sat on her lap. Valery observed the couple try to trip Leticia, kick her, and hit her in the head. Valery had exited the bus at that point, and she was not harmed in the same way as Leticia was; her only problem was that she did not have enough room to exit the bus and was squeezed in the process. Valery observed a shoe mark on Leticia's stomach and a broken fingernail. She remembered the bus driver telling Leticia to leave the bus because he was running late. Valery testified that the couple boarded the bus that was waiting behind their bus, and the police arrived immediately after the other bus had departed.

¶ 25    After the incident, Valery was afraid, and had trouble sleeping and concentrating, because she kept thinking about what had happened to Leticia. She visited a therapist, which made her feel better and safer.

¶ 26                            III. Plaintiffs' Response

¶ 27    On January 31, 2012, plaintiffs filed a response to the motion for summary judgment. Plaintiffs admitted that the CTA was entitled to summary judgment with respect to subparagraph (b) of their complaint, which alleged that the CTA failed to protect plaintiffs

from the criminal acts of third persons. However, plaintiffs claimed that the CTA's liability did not flow from its failure to protect them from the assault "but rather from its *creation* of a condition that exposed the Plaintiff and her daughter to a danger of assault which occurred when the exercise of reasonable foresight would have anticipated it and with due care avoided." (Emphasis in original.) Plaintiffs argued that the CTA's operation of the bus caused overcrowding, which was then aggravated by "its poor handling of persons entering the bus through the rear door of the bus at the Kimball Avenue station." Thus, plaintiffs argued that section 27 of the Act did not shield the CTA from liability. Plaintiffs further argued that the question of whether crowding was a proximate cause of plaintiffs' injuries was a question of fact for the jury.

¶ 28                              A. Edward Villareal's Deposition

¶ 29        Attached to plaintiffs' response to the CTA's motion for summary judgment was the transcript of the discovery deposition of Edward Villareal, taken on July 22, 2011. Villareal testified that he is a CTA employee who was collecting fares at the rear door of CTA buses at Kimball and Belmont on May 27, 2009, as part of a CTA pilot program. Villareal testified that, as part of the pilot program, he received a half hour of verbal instruction prior to beginning the fare collection; there was no instruction regarding loading passengers onto the bus or bus bunching.

¶ 30        Villareal testified that he was aware that buses operated on schedules, but that even if he knew the schedule of the route 77 buses, it would not have mattered, because "[k]eeping schedule on paper and doing it is [*sic*] two different things." Some days, all of the buses would be on time, and on others, all of them would be late due to weather or traffic and that "[n]o one could ever know" whether the buses would be on time or not. Villareal opined that a bus is overloaded when no more people could board the bus without the doors remaining open and that the fact that someone was standing in a doorway did not necessarily mean that a bus was overcrowded, since "people have the habit of getting on the bus and standing where they are put."

¶ 31        Villareal did not concern himself with what happened after the passengers boarded the bus, since "[m]y responsibility was to get the people to pay their fare using the mobile fare box and getting them through the door. What they did after that, if they sat on each other's laps, I don't know." Villareal testified that, while driving a bus, he instructs passengers to stand behind the yellow line at the front of the bus, but as a fare collector, he did not advise people boarding through the rear door to keep moving instead of blocking the doorway, even though he was aware that people standing in the doorway could block people exiting the bus.

¶ 32        Villareal testified that he was familiar with a CTA general bulletin concerning harassment. The undated general bulletin, also attached as an exhibit to plaintiffs' response, provided in part:

        "The CTA serves a diverse population of over 2.8 million people. Therefore, as Bus Operators, you will encounter customers that have different cultures, backgrounds and ethnicities. And sometimes, there are people who harbor inflammatory biases and prejudices, and take their 'hostility' out on the people they encounter in public

-6-

environments such as public transportation. Yet, our customers expect and deserve to travel to their destinations safely and without incident.....without harassment.

Those of you with years of service have probably encountered personal harassment on the job. Yet, you have managed to control such situations. But, many of our customers are not able to handle those same situations. And, they will look to you for help.

It is our responsibility to assist customers who are being subjected to harassment. Whether the harassment is based on race, gender or religious-affiliation; customers being drawn into conversations with sexual or violent undertones; or customers being threatened, slapped, spit on, injured or subjected to 'up in your face' conversations by others, we must prevent harassment by using the tools and procedures we have in place."

¶ 33                                   B. Michael Haynes' Deposition

¶ 34        Also attached to plaintiffs' response was the transcript of the deposition of Michael Haynes, taken on September 2, 2011. Haynes testified that he is a project coordinator with the CTA and managed the automatic passenger counter data and the automatic vehicle location data for the CTA. Haynes testified that, based on the data in the database, the route 77 buses were scheduled to operate a "six-minute street," or six minutes between buses.

¶ 35        Haynes testified that a bus in front of another bus was referred to as the "leader," while the bus behind the leader was referred to as the "follower." At the Halsted stop, the leader and follower bus were 8 minutes and 35 seconds apart. At the Ashland stop, the buses were 12 minutes and 26 seconds apart. With such a delay, Haynes testified that "[h]e's becoming late and it is likely that additional passengers are arriving at the stops and he's becoming late for them." At the stop at Belmont and Western, the buses were 14 minutes and 9 seconds apart, and at Kimball and Belmont, they were 14 minutes and 16 seconds apart. Haynes opined that this level of disparity between the scheduled and actual times would be considered something that the bus on-street supervisors would be interested in looking into if they had actively been monitoring that particular route at that particular time.

¶ 36        At the Ashland stop, the bus following the delayed bus was 2 minutes and 44 seconds behind the bus. As of the Western stop, the buses were "bunched," meaning that they were less than one minute apart.

¶ 37                                   C. Keith Wilkins' Deposition

¶ 38        Also attached to plaintiffs' response was the transcript from the deposition of Keith Wilkins, taken on June 2, 2011. Wilkins testified that he is a field supervisor with the CTA, in charge of monitoring a district that encompassed the number 77 bus route. Wilkins drives in a marked CTA vehicle and patrols his assigned district; his district included 10 routes, but he was only able to monitor 5 at a time via a CTA laptop computer located in his vehicle.

¶ 39        Wilkins testified that he was responsible for monitoring and preventing bus bunching, so if he observed that a bus was delayed, he would attempt to restore service to the affected run; for instance, he could order a bus to run express for several stops in order to restore proper service. Wilkins testified that if a bus is operating on schedule and not ahead of

schedule, it is permitted to go around a bus that was standing and loading passengers.

¶ 40                                     D. Darryl Daniels' Deposition

¶ 41    Also attached to plaintiffs' response was the transcript from the deposition of Darryl Daniels, taken on June 2, 2011. Daniels testified that he was the bus operator on the bus on which plaintiffs were attacked, and that at the Central Park stop, he observed an altercation between Leticia and an African-American man in his rearview mirror; the man was traveling with a woman. Daniels contacted the CTA control center, exited the bus and approached the rear door, where the altercation had taken place. He informed them that the police were on their way, and the man left; Daniels denied encouraging him to leave the scene.

¶ 42                                     IV. Trial Court Ruling

¶ 43    On March 7, 2012, the parties came before the trial court for a hearing on the CTA's motion for summary judgment. The court found that the CTA did not proximately cause plaintiffs' injuries, noting that, even accepting plaintiffs' facts as true, there was no evidence connecting the crowded bus to Leticia's assault, nor was it foreseeable that such a result would occur from overcrowding. The court also noted that the cases cited by plaintiffs were distinguishable, since they did not involve criminal attacks on the plaintiffs and were decided before section 27 immunity existed. Consequently, the trial court found that the CTA was immune from liability for the third-party criminal acts pursuant to section 27 of the Act and was also entitled to summary judgment on the immunity.

¶ 44                                     V. Motion to Reconsider

¶ 45    On April 6, 2012, plaintiffs filed a motion to reconsider, as well as requesting leave to amend their complaint "to additionally allege that the CTA was negligent in loading passengers through the rear door so that the last persons boarding were standing in the exit." Plaintiffs argued that it was not clear whether the trial court had applied the highest degree of care to the CTA's actions toward its passengers. Plaintiffs further argued that the trial court's decision effectively meant that any time a criminal assault was involved, the CTA could never be liable, regardless of whether it violated its standard of care.

¶ 46    The trial court denied plaintiffs' motion on July 19, 2012, including a denial of plaintiffs' request to amend the complaint. In denying plaintiffs' motion, the court noted:

"By way of discussion, the highest degree of care, quote, unquote, is the standard of care applicable to a common carrier. However, Plaintiff argues there is a greater standard of care pursuant to a case decided almost a century ago, Ross versus Chicago Railway Company, 294 Ill. App. 586 at 591, in the year 1920. That case stated a carrier, quote, is required to do all that human care, vigilance, and foresight can reasonably do, unquote, for, quote, passengers while entering and alighting cars, unquote. The Plaintiff's reliance on Walsh and other superannuated or out-of-state cases is misplaced, as they have little or no precedential value or authority. Moreover, the decided Illinois cases of Torf and Lutz do not involve criminal acts by other passengers."

The court concluded:

> "Plaintiff unfortunately was attacked by other passengers on the CTA bus. There is no genuine issue of material fact that the Plaintiff's injuries were caused by the criminal acts of the third parties and the CTA did not proximately cause Plaintiff's injuries. None of the case cited by Plaintiff involves criminal acts on public conveyance nor do they create a different or greater standard of care for a common carrier. The Court applied the law regarding the highest standard of care and foreseeability and the Defendant is entitled to the immunity provided by Section 27 of the Metropolitan Transit Act. Plaintiff's motion for reconsideration and request to amend its Complaint is denied."

This appeal follows.

¶ 47                                                    ANALYSIS

¶ 48    On appeal, plaintiffs argue that the trial court erred in granting summary judgment in the CTA's favor because section 27 immunity did not apply to their cause of action and the issue of proximate cause was a question of fact. A trial court is permitted to grant summary judgment only "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2-1005(c) (West 2008). The trial court must view these documents and exhibits in the light most favorable to the nonmoving party. *Home Insurance Co. v. Cincinnati Insurance Co.*, 213 Ill. 2d 307, 315 (2004). We review a trial court's decision to grant a motion for summary judgment *de novo*. *Outboard Marine Corp. v. Liberty Mutual Insurance Co.*, 154 Ill. 2d 90, 102 (1992). *De novo* consideration means we perform the same analysis that a trial judge would perform. *Khan v. BDO Seidman, LLP*, 408 Ill. App. 3d 564, 578 (2011).

¶ 49    "Summary judgment is a drastic measure and should only be granted if the movant's right to judgment is clear and free from doubt." *Outboard Marine Corp.*, 154 Ill. 2d at 102. However, "[m]ere speculation, conjecture, or guess is insufficient to withstand summary judgment." *Sorce v. Naperville Jeep Eagle, Inc.*, 309 Ill. App. 3d 313, 328 (1999). A defendant moving for summary judgment bears the initial burden of proof. *Nedzvekas v. Fung*, 374 Ill. App. 3d 618, 624 (2007). The defendant may meet his burden of proof either by affirmatively showing that some element of the case must be resolved in his favor or by establishing " 'that there is an absence of evidence to support the nonmoving party's case.' " *Nedzvekas*, 374 Ill. App. 3d at 624 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). In other words, there is no evidence to support the plaintiff's complaint.

¶ 50    " 'The purpose of summary judgment is not to try an issue of fact but *** to determine whether a triable issue of fact exists.' " *Schrager v. North Community Bank*, 328 Ill. App. 3d 696, 708 (2002) (quoting *Luu v. Kim*, 323 Ill. App. 3d 946, 952 (2001)). " 'To withstand a summary judgment motion, the nonmoving party need not prove his case at this preliminary stage but must present some factual basis that would support his claim.' " *Schrager*, 328 Ill. App. 3d at 708 (quoting *Luu*, 323 Ill. App. 3d at 952). We may affirm on any basis appearing in the record, whether or not the trial court relied on that basis or its reasoning was correct. *Ray Dancer, Inc. v. DMC Corp.*, 230 Ill. App. 3d 40, 50 (1992).

¶ 51    In the case at bar, plaintiffs take issue with two of the trial court's conclusions: that plaintiffs' injuries were not proximately caused by the CTA and that section 27 immunity protected the CTA from liability. We agree with the trial court's finding concerning causation and, accordingly, find it unnecessary to consider the applicability of the section 27 immunity.

¶ 52    To state a cause of action for negligence, a plaintiff must allege facts in his complaint that establish the existence of a duty of care owed by the defendant to the plaintiff, a breach of that duty, and an injury proximately caused by the breach. *Marshall v. Burger King Corp.*, 222 Ill. 2d 422, 430 (2006) (citing *Bajwa v. Metropolitan Life Insurance Co.*, 208 Ill. 2d 414, 421 (2004)). " 'proximate cause requires the plaintiff to show that the defendant's negligence was (1) the actual cause or the cause in fact of his injury, *i.e.*, but for the defendant's conduct, the accident would not have occurred; and (2) the legal cause of his injury, *i.e.*, the defendant's conduct was so closely tied to the plaintiff's injury that he should be held legally responsible for it.' " *Bourgonje v. Machev*, 362 Ill. App. 3d 984, 1007 (2005) (quoting *McCraw v. Cegielski*, 287 Ill. App. 3d 871, 873 (1996)). "The proper inquiry regarding legal cause involves an assessment of foreseeability, in which we ask whether the injury is of a type that a reasonable person would see as a likely result of his conduct." *City of Chicago v. Beretta U.S.A. Corp.*, 213 Ill. 2d 351, 395 (2004) (citing *Lee v. Chicago Transit Authority*, 152 Ill. 2d 432, 456 (1992)). While the issue of proximate cause is generally a factual issue, " 'it is well settled that it may be determined as a matter of law by the court where the facts as alleged show that the plaintiff would never be entitled to recover.' " *Bourgonje*, 362 Ill. App. 3d at 995 (quoting *Abrams v. City of Chicago*, 211 Ill. 2d 251, 257-58 (2004)).

¶ 53    Additionally, in a negligence action, courts distinguish between a condition and a cause. *Beretta*, 213 Ill. 2d at 405; *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 257 (1999). "If a defendant's breach of duty furnishes a condition by which injury is made possible and a third person, acting independently, subsequently causes the injury, the defendant's creation of the condition is not a proximate cause of the injury." *Beretta*, 213 Ill. 2d at 405-06 (citing *Briske v. Village of Burnham*, 379 Ill. 193, 199 (1942)). In the case at bar, the alleged breach of duty is the CTA's overcrowding of its buses. Plaintiffs argue that there is a question of fact as to whether the overcrowding of their bus was the proximate cause of their injuries. We do not find plaintiffs' argument persuasive.

¶ 54    Concerning the cause-in-fact prong of the proximate cause analysis, plaintiffs argue that the CTA's overcrowding of the bus was the cause in fact of their injuries because, had the rear door operator loaded the assailants onto a different bus, the attack would not have occurred. Additionally, plaintiffs argue that the rear door operator knew that people boarding a crowded bus had the tendency of standing in the doorway, enabling the assailants to impede plaintiffs' exit from the bus.

¶ 55    First, plaintiffs make much of the fact that the number 77 buses were not running on schedule, resulting in bus bunching and overcrowding of buses. However, the CTA admits that the bus on which plaintiff was riding was crowded. Nevertheless, there was no evidence of where the assailants were in the line to board the bus at the Kimball stop; there is no indication that they were the last individuals to board the bus or that the bus was crowded at the time they boarded. Leticia's testimony only indicates that the assailants boarded the

-10-

bus at the Kimball stop and that, after loading passengers at that stop, the bus was crowded. Thus, plaintiffs fail to make a connection between the bus' overcrowded state and the boarding of the two passengers who attacked plaintiffs.

¶ 56 Moreover, while Villareal opined that a bus was overloaded when no more people could board the bus without the doors remaining open, he also testified that the fact that someone was standing in a doorway did not necessarily mean that a bus was overcrowded, since "people have the habit of getting on the bus and standing where they are put." In other words, people stood in the doorways regardless of the number of people on the bus. Thus, this argument also fails to establish a connection between the overcrowding of the bus and plaintiffs' injuries.

¶ 57 In fact, the major problem with plaintiffs' argument is that there is absolutely no evidence in the record connecting the assault to the overcrowding of the bus. Leticia's testimony indicates that the couple boarded the bus behind a Mexican man and began screaming racial slurs and insults at him; Leticia had "[n]o idea" what prompted the couple to make comments to the Mexican man. The Mexican man did not respond and instead walked away, but Leticia asked the woman to lower her voice because she was upsetting Valery. Instead, the couple began insulting Leticia. Leticia decided to exit the bus at the next stop, but the couple began punching and kicking her as she attempted to exit.

¶ 58 The case at bar does not involve an altercation over finding a seat or inadvertent pushes or contact, as would be expected if the overcrowding had been the cause of plaintiffs' injuries. Instead, the conduct here, though unfortunate, appears to have been purely the result of racial and ethnic hostility. There is no indication that the couple would not have behaved exactly the same way had the bus been half-full or even empty.

¶ 59 In fact, several of the cases plaintiffs cite in support of their argument demonstrate the type of conduct that would be caused by a bus' overcrowded state. For instance, in *Walsh v. Chicago Rys. Co.*, 294 Ill. 586, 588 (1920), a woman riding a crowded streetcar attempted to exit and "was immediately pushed and jostled by those moving toward the exit," until she was pushed off the streetcar platform by the crowd and fell, injuring herself. Similarly, in *Lutz v. Chicago Transit Authority*, 36 Ill. App. 2d 79, 81-82 (1962), a woman riding a crowded CTA bus was standing near the front door when the bus stopped unexpectedly and she was pushed out of the bus by another woman. The appellate court noted that the push could have been a deliberate act of the other woman but that it was also reasonable to conclude "that the woman was not just an individual acting independently, but was, rather, the outer edge of the movement toward the front exit and that she put her hands on Mrs. Lutz's back to steady herself against pressure from the rear; that the congested condition within the bus contributed to this forward movement; that it was accentuated by the bus stopping sooner than expected, which created the apprehension among these passengers who wanted to get off that they might not be able to or that they might not make connections with the elevated trains." *Lutz*, 36 Ill. App. 2d at 85. Accordingly, the *Lutz* court found, *inter alia*, a question of fact concerning whether the overcrowding was the proximate cause of the woman's injury. *Lutz*, 36 Ill. App. 2d at 85.

¶ 60 In the case at bar, unlike in plaintiffs' cited cases, the attack was a deliberate action by

third parties and was not the result of the bus' overcrowded state. Accordingly, the CTA's conduct in permitting the bus to become overcrowded was not a cause in fact of plaintiffs' injuries, and the trial court did not err in finding no causation.

¶ 61    Additionally, we cannot find that the CTA's conduct was the legal cause of plaintiffs' injuries. As noted, "[t]he proper inquiry regarding legal cause involves an assessment of foreseeability, in which we ask whether the injury is of a type that a reasonable person would see as a likely result of his conduct." *Beretta*, 213 Ill. 2d at 395 (citing *Lee*, 152 Ill. 2d at 456). Plaintiffs argue that it was foreseeable that, when a bus became crowded, passengers would be injured by other passengers. Plaintiffs also point to the service bulletin in which the CTA noted that "sometimes, there are people who harbor inflammatory biases and prejudices, and take their 'hostility' out on the people they encounter in public environments such as public transportation." We do not find plaintiffs' argument persuasive.

¶ 62    Again, the main issue here is whether the type of injury inflicted on plaintiffs is the type that a reasonable person would determine as a likely result of the CTA's overcrowding of its buses. The existence of the service bulletin, which the CTA correctly notes is a document referencing an internal policy, indicates that the CTA was arguably aware that some of its passengers harbor inflammatory biases and prejudices. However, having that knowledge is a far cry from foreseeability that passengers would physically attack another passenger due to those prejudices if the bus became overcrowded. It is foreseeable that crowding-type injuries would occur, such as in *Walsh* and *Lutz*. However, it would not be foreseeable for the type of injury that occurred here to occur due to the bus' overcrowding. A physical attack by two passengers on plaintiffs has no relationship to the overcrowding that occurred here. Accordingly, the CTA's conduct is also not the legal cause of plaintiffs' injuries.

¶ 63    Since we have determined, regardless of the CTA's immunity, that there was no causation, we need not analyze the scope of section 27 immunity to determine whether it is applicable in the instant case and affirm the trial court's grant of summary judgment in the CTA's favor.

¶ 64                                          CONCLUSION

¶ 65    The trial court's grant of summary judgment in favor of the CTA is affirmed, since the CTA's conduct in overcrowding its buses was not a proximate cause of plaintiffs' injuries.

¶ 66    Affirmed.