# Illinois Official Reports

## Appellate Court

---

**Atchley v. University of Chicago Medical Center, 2016 IL App (1st) 152481**

---

| | |
|---|---|
| Appellate Court Caption | STEVEN R. ATCHLEY, Individually and as Special Administrator of the Estate of Linda Atchley, Deceased, Plaintiff-Appellant, v. UNIVERSITY OF CHICAGO MEDICAL CENTER, Defendant and Third-Party Plaintiff-Appellee (Home Juice Corporation, Third-Party Defendant). |
| District & No. | First District, Third Division<br>Docket No. 1-15-2481 |
| Filed<br>Rehearing denied | September 28, 2016<br>October 27, 2016 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 10-L-10545; the Hon. Lynn M. Egan, Judge, presiding. |
| Judgment | Reversed and remanded. |
| Counsel on Appeal | Richard L. Pullano and Matthew Siporin, both of Law Offices of Richard L. Pullano, of Chicago, and Andrew J. Kriegel and Paul W. Grauer, both of Paul W. Grauer & Associates, of Schaumburg, for appellants.<br><br>Matthew L. Johnson and Garrett L. Boehm, Jr., both of Johnson & Bell, Ltd., of Chicago, for appellee. |

JUSTICE LAVIN delivered the judgment of the court, with opinion.
Presiding Justice Fitzgerald Smith and Justice Pucinski concurred in the judgment and opinion.


**OPINION**

¶ 1    Steven Atchley, a delivery employee of Home Juice Corp. (HJC), went to the University of Chicago Medical Center (UCMC) to deliver two pallets of beverages. After backing his delivery truck into a dock space, he discovered that the dock leveler, which would raise the dock to the height of the truck bed and create a ramp, was inoperable. Unbeknownst to Steven, the leveler had been broken and inoperable for over six months. Because no other docks with levelers were then available, Steven used his truck's air suspension system to lower the truck bed as much as possible, but a small gap remained. He proceeded to use a motorized pallet jack to unload his truck, but the jack became stuck in the gap. While using a steel dolly in an attempt to free the jack, Steven fell and fractured his ankle.

¶ 2    Steven and his wife, Linda Atchley, then filed this ordinary negligence and premises liability action against UCMC, which in turn raised contributory negligence as an affirmative defense.[1] The circuit court granted summary judgment in favor of UCMC, finding that the danger was open and obvious, that UCMC had no duty as a result and that the inoperable leveler was not a proximate cause of Steven's injuries. Steven now appeals. We reverse and remand for further proceedings.

¶ 3    As a threshold matter, we observe that Steven's fact section fails to support facts with citations to the record, provides incorrect citations to the record, provides incorrect facts and omits certain pertinent facts. See Ill. S. Ct. R. 341(h)(6) (eff. Jan. 1, 2016). His argument section repeats those defects but additionally presents inaccurate citations to case law. See Ill. S. Ct. R. 341(h)(7) (eff. Jan. 1, 2016). This court is not a depository into which appellants may dump the burden of research. *Hall v. Naper Gold Hospitality*, *LLC*, 2012 IL App (2d) 111151, ¶ 13. We strongly encourage counsel to exercise greater diligence with respect to any future briefs filed in this court.

¶ 4                              I. BACKGROUND
¶ 5    On August 11, 2010, Steven was assigned to deliver beverages to UCMC. Although Steven had made at least 25 deliveries there over two or three years, he did not routinely go there; rather, he was filling in for fellow HJC driver Ronald Rosario. Steven had also made that delivery for Rosario two days before this incident.

¶ 6    UCMC's docks opened for deliveries at 5 a.m. Steven testified in his deposition that while HJC did not require him to make the delivery by a specific time, the hospital was accustomed to early delivery and he tried to do what Rosario did. Rosario testified that hospitals preferred early morning deliveries. Similarly, James Cahill, HJC's former supervisor, testified that hospital deliveries were generally made early in the morning. Steven further testified that

_____

[1]Linda died after this action was filed.

HJC's motto was, "take care of the customer," which he understood to mean that he should make deliveries in a timely manner.

¶ 7   According to an affidavit submitted by Steven, when he arrived at UCMC at about 5 a.m., a security guard let him in the gate but did not assign him to a particular dock or ask if he needed a leveler. Steven also testified that he had never been aware that dock 5's leveler was broken. While certain deposition testimony from UCMC employees suggested that drivers would be assigned to a particular dock, Sheila Stevens, the security guard monitoring the gate at the time in question, ultimately indicated that she only told drivers which dock to use if they asked. Sheila further testified that she had been unaware of any problem with dock 5. Moreover, Sheila and Rosario testified that no one from UCMC supervised the loading and unloading of trucks, corroborating Steven's testimony that he saw no security guards in the loading area.

¶ 8   Steven, who had never made a delivery without a leveler, parked his truck in a dock that had one but then moved his truck to dock 5 in order to accommodate another driver. No signs indicated that dock 5 was out of service, but when he pulled the chain to operate the leveler, nothing happened. Consequently, his truck bed was higher than the dock. Steven stated that he did not report this malfunction to any UCMC employee, however, because none were around. Similarly, no drivers were around. Steven further testified that no other docks with levelers were available and he could not wait for one because UCMC was used to early deliveries. Steven's affidavit added that it was common for drivers to do what was necessary to make a timely delivery, that there was no place for his truck to wait for another dock and that if another dock became available, an incoming driver would take it. Moreover, Steven had never been instructed to wait for another dock if experiencing difficulty.

¶ 9   Steven used his truck's air suspension system to lower the truck bed. After doing so, the bed of the truck was about two or three inches higher than the dock. Steven stated in his affidavit that he had received no training regarding what height differential would be significant to safety. Additionally, Steven testified both that no lateral distance existed between the truck and the dock, and that a distance of less than a foot existed. He also noticed that two wooden wedges had been positioned on the sides of the dock.

¶ 10   Having lowered the truck, Steven used a motorized pallet jack, which has forks that lift pallets, to successfully remove the first pallet from the truck. Steven's affidavit stated, "I believe it was a reasonable and safe method based on my experience; especially since pallet #1 came off the truck safely." After leaving that 1500-pound pallet by the elevator, he went to retrieve the second pallet. He was trying to make the delivery as quickly as possible, as he did not want to take the elevator down to the delivery tunnels twice.[2]

¶ 11   After removing the first pallet, the truck bed rose to three or four inches above the dock. As he attempted to return the pallet jack to the truck to retrieve the second pallet, the jack became stuck in the gap, a problem he had never encountered before. Specifically, the pallet jack's forks were already in the truck when the jack "flipped," leaving two feet of the jack hanging off the truck. The jack's wheels were not touching the dock floor.

¶ 12   Steven testified that he did not seek assistance because no one was around. He did not go look for anyone either. According to Sheila, drivers never brought problems to her attention.

---

[2]The record suggests that after taking the elevator downstairs to the tunnels, Steven would have to walk approximately 1570 steps to make his deliveries and return to his truck.

Steven added in his affidavit that calling HJC would not have helped because it was 25 miles away. Additionally, Steven testified that he discovered a steel dolly on the dock, which he assumed belonged to UCMC. He positioned the dolly under the pallet jack and attempted to pry it loose. As he was doing so, the dolly slipped and he fell backward, breaking his ankle. Eventually, someone emptying the trash found Steven and got help. Meanwhile, Steven used his cell phone to call Cahill and 911. Steven ultimately underwent surgery and returned to light duty.

¶ 13    Ramon Mariscal, a UCMC security guard, initially testified that he only learned of a problem with dock 5 a day or two before this incident. At a later deposition, however, Mariscal acknowledged that he first observed the leveler was broken on January 25, 2010. The record shows that between that date and this occurrence, Mariscal stated in 95 daily condition reports that dock 5 was broken. Mariscal testified that at some point, without telling anyone, he put wooden shims in the leveler to keep the inoperable plate down. Although the dock could not be used with a pallet jack, it could still be used by handing out boxes or using carts. Moreover, Mariscal was not at work when the incident occurred. Dock 5 remained in use until it was repaired two days after the incident, in less than two hours, for $1022.90.

¶ 14    Anthony Harvard, UCMC's dock supervisor, testified that he was responsible for only the inside of the dock area. Security guards occasionally reported problems to him, which he would relay to the proper department, but he was not responsible for taking care of broken levelers and was not always informed of problems. In addition, Harvard first learned there was a problem with dock 5 after this incident. When he reported this incident to his supervisor, he became responsible for investigating it. Mariscal told Harvard that drivers were not being permitted to park at dock 5 and that wooden wedges were placed in the dock to prevent the leveler from moving. Furthermore, the plant department directed Harvard to a vendor who fixed levelers and he subsequently authorized the repairs.

¶ 15    Rosario testified that UCMC's docks were often broken and he had previously complained to a dock facility manager named Al. In addition, UCMC no longer provided a portable dock and it was not always possible to switch docks if the others were occupied. With that said, he would wait for another dock to become available. Furthermore, drivers sometimes used a board to hold up a defective leveler when encountering a different type of malfunction. Rosario would not have known what to do, however, if a pallet jack became stuck.

¶ 16    Mark Okoniewski, a fellow HJC driver, testified that he sometimes had difficulty with UCMC's dock levelers: if the leveler did not work, a driver would use "whatever else is available—you know, there's tools down there to use." Okoniewski further testified as follows:

> "[Steven] told me he tried to pull the pallet off with the mule, the electric jack, and it got—he said the wheels got stuck between the truck and the dock. And I said, 'where was the ramp? He said, it didn't work. And I says, why would you pull—try to pull a pallet off without a ramp with an electric mule? It ain't going to work. It's going to get stuck.
>
> And from earlier what you said, he pulled one off without a plate. My personal opinion, he was lucky doing it the first one… To try to do that without a ramp, personal opinion, again, nuts."[3]

---

[3]The record uses the terms "leveler" and "plate" interchangeably.

- 4 -

Okoniewski acknowledged that he lacked personal knowledge of the incident but believed that Steven acted in an unsafe manner. We note that Steven alleged in his affidavit that he was highly medicated while in the hospital and did not remember talking to Okoniewski.

¶ 17 HJC driver Jeff Chevale Williams testified that he was never instructed to use a mechanical jack without a dock leveler or another device to connect the end of the trailer to the dock itself. He also believed it would be unsafe to do so. If a dock leveler was not working, he would inform whoever was in the area. With that said, he did not witness the accident, did not know how Steven was injured and did not hold himself out as an expert in dock levelers or motorized pallet jacks.

¶ 18 Cahill testified that Steven was never the subject of any safety concerns. Additionally, HJC never trained Steven how to use a pallet jack and did not instruct drivers to use a dolly in the specific manner that Steven had used it. Cahill testified that, in hindsight, Steven's method of attempting to free the pallet jack was not safe because he was injured.

¶ 19 Steven also presented the opinions of three experts. According to engineer Michael Bracki, a dock leveler's purpose is to match dock height to variations in truck height through an adjustable height ramp. UCMC's leveler was in a state of disrepair, however, and Mariscal made it completely inoperable by driving wood shims between the leveler and the frame. In addition, security staff was not controlling the flow of traffic when Steven moved his truck at another driver's request. Furthermore, a driver facing an inoperable leveler had several issues to overcome but "the more insidious would be a dock height that was off by only a small amount initially. *** [T]he height difference would vary as the loaded weight on the delivery vehicle chassis changed." Bracki believed that when Steven removed the first pallet, the truck bed rose, exacerbating the height discrepancy and leading the pallet jack to become immobile.

¶ 20 Bracki opined that UCMC's failure to repair the leveler for 198 days, remove the dock from service or control dock traffic made it not only foreseeable but likely that this accident would occur. Bracki also stated, "[t]o claim that a driver getting stuck between the dock and truck because of a height disparity is unforeseeable or unpredictable is illogical given [that] the dock leveler is designed to prevent that very situation from existing." Additionally, Bracki found it was foreseeable that equipment would get stuck as a result of the broken leveler, although the specific method of injury in attempting to dislodge the equipment may not have been foreseeable. In like circumstances, Bracki "would have tried to find another forklift, but I think [Steven] said he couldn't find one and he wound up getting into this corner where he did something that obviously caused his injury." That being said, nothing prevented Steven from waiting for another dock. Bracki described Steven's conduct as "contributory."

¶ 21 Similarly, architect John Van Ostrand testified that Steven's conduct was a cause of his injuries. Had he waited for help and not attempted to unload his truck with a pallet jack, he would not have been injured. Van Ostrand also testified, however, that Steven "was doing the best he could under the circumstances, apparently." Van Ostrand found it was reasonably foreseeable that a driver, with knowledge of a gap, would nonetheless attempt to unload his truck, apparently even with a pallet jack. Additionally, UCMC experienced a breakdown in management and communications regarding the dock and UCMC should have taken dock 5 out of service until it was repaired.

¶ 22 Suzanne Alton-Glowiak, a mechanical engineer, added that UCMC failed to comply with voluntary regulations of the American National Standards Institute (ANSI) and mandatory regulations of the Occupational Safety and Health Administration (OSHA). Alton-Glowiak

opined that the defective leveler caused Steven's injuries, but she had no opinion as to whether Steven's conduct caused his injuries.

¶ 23 UCMC's expert, architect Robert Plichta, opined that UCMC employees did not act improperly regarding the management and maintenance of the loading dock and it was reasonable for them to be unaware that the leveler was inoperable for over six months. In addition, using dock 5 in a fixed position posed no risk of harm. Plichta also disagreed with Alton-Glowiak's application and assessment of ANSI and OSHA regulations. With that said, Plichta acknowledged that someone backing into dock 5 would not see the wedges or notice that the leveler was inoperable unless something was placed in the driveway. Plichta also acknowledged nothing indicated that UCMC made a conscious decision not to repair the leveler.

¶ 24 Plichta believed that after discovering that the leveler was not functioning, the dangers of using a motorized pallet jack would be very apparent. A reasonable delivery person would not even attempt to use a pallet jack without a leveler. Additionally, Plichta found it was unforeseeable that a driver would use dock 5 to unload cargo with a pallet jack in an untypical and unsafe manner, particularly because three other docks with levelers were available. A driver needing a leveler must use what is available or wait for another dock. Furthermore, Steven also could have moved the merchandise from the pallets onto a dolly, requiring several smaller loads, but Plichta acknowledged that time was a consideration. Furthermore, Plichta acknowledged that Steven had more experience than Plichta with respect to docks, levelers, and pallet jacks. Notwithstanding that acknowledgment, Plichta found that the leveler did not play a role in Steven's injury, even though the pallet jack would not have become stuck and Steven would not have used a dolly to dislodge it if the leveler had been working. When the pallet jack became stuck, Steven should not have used a dolly to try to move it. Instead, he could have called security. Plichta found it was unforeseeable that someone using dock 5 "would be injured unless they were using it the way that it was done here."

¶ 25 George Karosas, an engineering expert, testified that keeping dock 5 in service without the leveler posed no risk different from a permanent immovable dock. He did not know whether any drivers who parked at dock 5 prior to Steven's accident used pallet jacks without a leveler, but Karosas thought it was improbable, having never heard of anyone doing that before. Additionally, Steven should have waited for another dock. Karosas believed Steven caused the accident by "misusing the dolly in a fashion and trying to lift, you know, and maneuver something that weighs hundreds of pounds."

¶ 26 Following discovery, UCMC moved for summary judgment, arguing that it owed Steven no duty because the nonfunctional leveler constituted an open and obvious condition. UCMC also argued that the nonfunctional leveler did not cause Steven's injury. In response, Steven argued that the gap was not obviously dangerous and, alternatively, the deliberate-encounter exception applied. Steven further argued that UCMC's negligence was a proximate cause of his injuries and that the lay opinions of his coworkers, who did not witness the incident, were inadmissible.

¶ 27 The circuit court granted summary judgment in favor of UCMC, finding that a reasonable person would have determined that the leveler was inoperable and that a gap remained. Thus, the condition and risk were open and obvious. The court also found the deliberate-encounter exception to the open and obvious doctrine did not apply. Furthermore, UCMC did not owe a

duty to Steven or proximately cause his injury.

¶ 28                                    II. ANALYSIS

¶ 29        On appeal, Steven first asserts that the circuit court improperly granted summary judgment in favor of UCMC, which failed to demonstrate that it had no duty as a matter of law. We review the circuit court's ruling on a summary judgment motion *de novo*. *Willie Pearl Burrell Trust v. City of Kankakee*, 2016 IL App (3d) 150398, ¶ 10.

¶ 30        Summary judgment is appropriate only where the pleadings, admissions, depositions, and affidavits show that no genuine issues of material fact exist so that the movant is entitled to judgment as a matter of law. *Mashal v. City of Chicago*, 2012 IL 112341, ¶ 49. Conversely, summary judgment is inappropriate where material facts are in dispute, reasonable persons could draw different inferences from undisputed facts, or reasonable persons could assign different weight to factors relevant to the legal standard at issue. *Seymour v. Collins*, 2015 IL 118432, ¶ 42. Summary judgment is a drastic measure and, consequently, should only be granted where the movant's right to judgment is clear. *Mashal*, 2012 IL 112341, ¶ 49. Furthermore, we must strictly construe the record against the movant and liberally in favor of the nonmovant. *Seymour*, 2015 IL 118432, ¶ 42. In order to demonstrate negligence, Steven must ultimately show that UCMC owed him a duty, that UCMC breached that duty and that such breach proximately caused Steven's injury. See *Friedman v. City of Chicago*, 333 Ill. App. 3d 1070, 1073 (2002).

¶ 31                                    A. Duty

¶ 32        In determining whether a duty exists, courts must consider whether the plaintiff and the defendant stood in a relationship such that the law obligates the defendant to conduct itself reasonably for the plaintiff's benefit, considering four factors: (1) the reasonable foreseeability of the claimant's injury; (2) the likelihood of injury; (3) the magnitude of the defendant's burden of guarding against that injury; and (4) the consequences of placing the burden on the defendant. *Krywin v. Chicago Transit Authority*, 238 Ill. 2d 215, 225-26 (2010). The weight to be assigned to each factor depends on the circumstances of the case. *Simpkins v. CXS Transportation, Inc.*, 2012 IL 110662, ¶ 18. Additionally, a defendant's duty is not defined by the plaintiff's own negligence. *Ward v. K mart Corp.*, 136 Ill. 2d 132, 148 (1990). Furthermore, the open and obvious doctrine pertains to the element of duty in a negligence action. *Ballog v. City of Chicago*, 2012 IL App (1st) 112429, ¶ 20.[4]

¶ 33        Pursuant to that doctrine, a party that owns or controls land is not required to foresee or protect against injury where the potentially dangerous condition is open and obvious. *Bruns v. City of Centralia*, 2014 IL 116998, ¶ 16. An open and obvious danger does not automatically eliminate a legal duty on the defendant's part, however. *Bucheleres v. Chicago Park District*,

---

[4]Where a landowner's conduct creating a dangerous condition precedes the claimant's injury, the claimant may pursue a negligence theory, a premises liability theory or both. *Smart v. City of Chicago*, 2013 IL App (1st) 120901, ¶ 54. Although Steven contends that the open and obvious doctrine does not apply to ordinary negligence, he has failed to cite any case stating as such. See Ill. S. Ct. R. 341(h)(7) (Jan. 1, 2016) (requiring that arguments be supported by legal authority). We further observe that both Steven's premises liability claim and his ordinary negligence claim pertain to a condition on UCMC's premises.

171 Ill. 2d 435, 449 (1996). Instead, the existence of an open and obvious dangerous condition affects the first two factors relevant to assessing duty: the reasonable foreseeability and likelihood of the injury. *Bruns*, 2014 IL 116998, ¶ 19. Specifically, the open and obvious condition renders the impact of those factors slight, weighing against a determination that the defendant had a duty. *Id.* Even where the open and obvious rule applies, courts must consider all four factors relevant to duty. *Bucheleres*, 171 Ill. 2d at 456; but see *Ballog*, 2012 IL App (1st) 112429, ¶¶ 35, 40 (declining to apply the four factors after finding an open and obvious condition).

¶ 34    Obviousness requires that a reasonable person in the visitor's position, exercising ordinary intelligence, perception, and judgment, would recognize both the condition and the risk. *Bruns*, 2014 IL 116998, ¶ 16. Whether a condition constitutes an open and obvious danger generally presents a question of fact. *Qureshi v. Ahmed*, 394 Ill. App. 3d 883, 888 (2009). Where the parties do not dispute the condition's physical nature, however, the question is a legal one. *Ballog*, 2012 IL App (1st) 112429, ¶ 29.

¶ 35    Moreover, the open and obvious doctrine is subject to a deliberate-encounter exception. *Kleiber v. Freeport Farm & Fleet, Inc.*, 406 Ill. App. 3d 249, 258 (2010). That exception applies where the possessor of land had reason to anticipate that the invitee would proceed to encounter an open and obvious danger because a reasonable person in the invitee's position would find the advantages of the encounter outweigh the apparent risk. *Id.* "The deliberate-encounter exception recognizes that individuals will make deliberate choices to encounter hazards when faced with employment concerns and that those encounters are reasonably foreseeable by possessors of a property." *Id.* Similarly, the deliberate-encounter exception usually involves a plaintiff who is forced to choose between facing danger and neglecting his duties. *Lucasey v. Plattner*, 2015 IL App (4th) 140512, ¶ 42. With that said, courts applying this exception must focus on what a landowner should anticipate. *Kleiber*, 406 Ill. App. 3d at 258; see also Restatement (Second) of Torts § 343A (1965). Where the exception applies, duty analysis is reversed as to the first two factors. *Bruns*, 2014 IL 116998, ¶ 20.

¶ 36    Here, we question UCMC's contention that the open and obvious doctrine applies. A reasonable person in Steven's position would recognize that, due to the broken leveler, his truck remained higher than the dock. It does not immediately follow, however, that a reasonable person would recognize the risk involved. It is undisputed that the height differential was but a matter of inches. Steven's belief that a few inches would not pose a problem to unloading goods with a pallet jack is not inherently unreasonable. Additionally, it was not clearly unreasonable for Steven to expect that once off the truck, he would have no problem bringing the pallet jack back on the truck. Similarly, Bracki described the increase in a truck's height after removing cargo as insidious. Even with that increase, the height differential was just a few inches. We cannot say as a matter of law that a reasonable driver in Steven's position would recognize that a slight height differential, resulting from a broken leveler, would lead a pallet jack to get stuck and ultimately lead the driver to injure himself while attempting to free it. We note that the circuit court found Steven acknowledged he needed a leveler to unload his goods. While Steven may have understood that his efforts with the pallet jack might prove unsuccessful without a leveler, it does not follow that he understood that any lack of success would result in injury.

¶ 37    Moving on in our analysis, even if the condition and risk were deemed open and obvious, the deliberate-encounter exception would apply. Ample testimony showed that the hospital generally expected early deliveries, notwithstanding that no specific delivery time was set. Additionally, UCMC should expect that professional delivery drivers would make multiple deliveries in any given day. As Cahill indicated, a delay with respect to one delivery could create problems for later deliveries. Moreover, Van Ostrand testified it was foreseeable that a driver would choose to encounter a small gap. We further note that Rosario and Okoniewski indicated that drivers sometimes worked around mechanical difficulties. See also *Cihon v. Cargill, Inc.*, 293 Ill. App. 3d 1055, 1064 (1997) (finding a jury could conclude that the defendant had reason to expect that the plaintiff would walk on a plank to access a storage tank farm rather than walk 80 feet and step over a short wall to access the farm); *LaFever v. Kemlite Co.*, 185 Ill. 2d 380, 393 (1998) (rejecting the defendant's assertion that a deliberate encounter cannot give rise to liability unless no reasonable alternative to encountering the danger exists and unless the worker's continued employment is threatened by not encountering the risk). Thus, UCMC had reason to anticipate that a delivery driver trying to fulfill his employment duties by making quick deliveries would choose to encounter a small gap rather than disrupt his delivery schedule or deviate from HJC's general practice of delivering early. *Cf. Kleiber*, 406 Ill. App. 3d at 258-60 (where the parties did not dispute the danger at issue was open and obvious, the reviewing court found the deliberate-encounter exception did not apply because the plaintiff had no economic reason, such as a job, to choose to encounter the danger and could have asked a store employee for assistance); *Ballog*, 2012 IL App (1st) 112429, ¶¶ 40-41 (where there was "no contention that the plaintiff was compelled to encounter the open and obvious condition" and the evidence showed she previously avoided the condition, rather than deliberately encountering it, the deliberate-encounter exception did not apply).

¶ 38    UCMC nonetheless argues it did not have reason to expect that a driver would decline to wait for another dock to become available. In doing so, UCMC distorts Steven's testimony by stating he conceded that nothing prevented him from moving to another dock. While Steven initially suggested as such, he immediately corrected himself, stating that he could not move to another dock because no other docks with levelers were available. Furthermore, while UCMC contends that the lay opinions of other HJC drivers support UCMC's position, Steven maintains that those individuals did not witness the incident and, thus, their opinions are inadmissible. Contrary to UCMC's assertion, Steven preserved this contention below.

¶ 39    Courts may not consider inadmissible evidence in support of, or in opposition to, a motion for summary judgment. *Lacey v. Perrin*, 2015 IL App (2d) 141114, ¶ 52. In addition, Steven correctly observes that a lay witness can offer his opinion only if it is based on his personal observations, is one that people generally can make and is helpful to the trier of fact. *Klingelhoets v. Charlton-Perrin*, 2013 IL App (1st) 112412, ¶ 44. "If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Ill. R. Evid. 701 (eff. Jan. 1, 2011). Here, no one witnessed the incident. Accordingly, to the extent the other HJC drivers purported to opine on the reasonableness of Steven's actions, their testimony is inadmissible. Moreover, their general opinions based on specialized knowledge specific to dock equipment would also be inadmissible unless those

witnesses were certified as experts. Notwithstanding these rules pertaining to the admissibility of evidence, UCMC contends that the opinions of HJC drivers were properly before the court as evidence of the general practices and knowledge of personnel that may encounter the condition at issue, relying on *Sepesy v. Archer Daniels Midland Co.*, 97 Ill. App. 3d 868, 870 (1981), and *Ballog*, 2012 IL App (1st) 112429, ¶¶ 7-8. Neither case, however, involved a challenge to the admissibility of evidence.

¶ 40   Even assuming that lay witnesses can testify regarding the general knowledge among professionals, UCMC has not shown that a different result is required. First, Okoniewski, without personal knowledge, opined on the reasonableness of Steven's specific actions, not the general practice of delivery drivers. In addition, he specified that he was offering his personal opinion. While Rosario testified it would be appropriate for a driver encountering a nonfunctioning leveler to wait for another dock, he did not testify that it would be inappropriate to act otherwise. At best, Steven's other fellow drivers testified regarding what they personally would have done, not what drivers generally would do or generally know about levelers, motorized pallet jacks, height differentials, or steel dollies. Moreover, UCMC ignores that one experienced driver, Steven, found no inherent danger in navigating a small gap. Van Ostrand specifically testified it was foreseeable that a driver would attempt to unload his truck despite the gap.

¶ 41   Accordingly, the record supports Steven's assertion that UCMC had a duty. It was reasonably foreseeable that, in the course of his employment, a driver such as Steven would attempt to make a delivery at dock 5 despite the broken leveler. Additionally, it is foreseeable that a driver who had never faced a broken leveler would be unaware that even a small gap could create a problem and that an insidious increase in height differential would occur after goods were removed. Furthermore, injury was likely given that the leveler was broken for months, that the record shows not all security guards knew to direct drivers needing levelers away from dock 5, and that no UCMC employees were in the vicinity of the unloading area. We also note that UCMC categorically ignores undisputed testimony that no employees were around, as well as Harvard's testimony that he was not responsible for the unloading area. Thus, it is not at all clear that seeking help presented a viable option.

¶ 42   While UCMC states "it was not likely that he would then slip while using the hand dolly and brake [*sic*] his ankle," it was sufficiently likely that some driver, trying to make an expeditious delivery, would injure himself in some manner as a result of the broken leveler. Contrary to UCMC's contention, Van Ostrand did not testify that Steven should have waited for help instead of using the dolly. Although Van Ostrand testified Steven would not have been injured if he "just sat around and waited for help," Van Ostrand also testified, "[e]ven the security person is not there. So he does the best thing he can. He gets this [dolly]." In Bracki's affidavit, he similarly disagreed with UCMC's belief that Steven's attempt to free the motorized pallet jack was unforeseeable.

¶ 43   Moreover, UCMC has not identified any onerous burden in requiring the hospital to remedy the broken leveler, whether by warning drivers, blocking off the area or having the leveler repaired. A $1022.90 bill to repair a busy deliver dock is inconsequential. Furthermore, UCMC has identified no consequences of placing this burden on the hospital. As a result, the circuit court erroneously entered summary judgment on the basis of duty.

¶ 44                                    B. Proximate Cause

¶ 45        We also agree with Steven's assertion that a genuine issue of material fact exists as to proximate cause. Proximate cause is defined as a cause that, in the ordinary course of events produced the plaintiff's injury, but a cause need not be the only or last cause; rather, the combination of multiple causes may result in the injury. *Richter v. Village of Oak Brook*, 2011 IL App (2d) 100114, ¶ 21. In addition, proximate cause includes cause in fact and legal cause. *Krywin*, 238 Ill. 2d at 225-26. Cause in fact exists where a reasonable certainty exists that the defendant's acts caused the injury. *Id.* at 226. Specifically, courts consider whether the defendant's conduct was a material and substantial factor in bringing about the claimant's injury. *Abrams v. City of Chicago*, 211 Ill. 2d 251, 258 (2004). Conduct constitutes a material and substantial factor if the injury would not have occurred absent the defendant's conduct. *Id.* With respect to legal cause, the inquiry is whether the injury sustained is one that a reasonable person would consider to be a likely consequence of his conduct. *Young v. Bryco Arms*, 213 Ill. 2d 433, 446-47 (2004). With that said, a reasonable person need not be able to foresee the exact way that the injury would occur or the extent of the injury. *Hooper v. County of Cook*, 366 Ill. App. 3d 1, 7 (2006). Furthermore, proximate cause constitutes a question for the trier of fact to decide. *Thompson v. Gordon*, 241 Ill. 2d 428, 438-39 (2011).

¶ 46        Here, the record would permit a trier of fact to find that UCMC's conduct was a material and substantial factor in bringing about Steven's injury, as Steven would not have been injured but for the leveler being broken. Specifically, the motorized pallet jack would not have become stuck, Steven would not have attempted to use another device to free it, and he would not have hurt himself while doing so. Thus, the broken leveler constitutes cause in fact. Additionally, ample evidence would permit a trier of fact to find it foreseeable that a broken leveler could result in a broken ankle.

¶ 47        The purpose of the leveler was to eliminate any height differential. Without a leveler, a differential of some kind was likely to exist. As stated, it is common knowledge that drivers, not just HJC drivers, make multiple deliveries in a day. Even if not adhering to a precise schedule, delivery drivers are likely to be in a hurry. Thus, a trier of fact could find it foreseeable that an expeditious driver would choose to navigate a gap of only a few inches where no other levelers were available, rather than wait for some unknown amount of time for a leveler to become available. Additionally, a trier of fact could find it foreseeable that a driver would not appreciate that the slight change in height after removing cargo would make it difficult to get the pallet jack back on the truck. Moreover, a trier of fact could find it foreseeable that, in the absence of any UCMC employees, a driver would find another device to dislodge the pallet jack, injuring himself in the process.

¶ 48        In reaching this determination, we reject UCMC's contention that the broken leveler constitutes a mere condition, rather than a cause of Steven's injury. If a defendant's breach of duty provides a condition which makes an injury possible, and an *independent third person* then causes an injury, the defendant's creation of the condition does not constitute a proximate cause of the injury. *Trigsted v. Chicago Transit Authority*, 2013 IL App (1st) 122468, ¶ 53. That being said, the test is always whether the first wrongdoer might reasonably have anticipated the intervening efficient cause as a probable and natural result of his own negligence. *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 257 (1999).

¶ 49        Steven would not have been injured but for the broken leveler and no independent third party was involved. Additionally, UCMC arguably should have anticipated that absent any

warnings or the removal of the dock from service a driver would be injured due to the broken leveler at some point during the multiple months that it was broken. *Cf. First Springfield Bank & Trust*, 188 Ill. 2d at 261 (finding after trial that it was not reasonably foreseeable that violating a no parking sign would result in a pedestrian (1) jaywalking, (2) attempting to cross a truck route despite a compromised view of traffic, and (3) being hit by another vehicle). Thus, the record does not compel a determination that the broken leveler was a mere condition.

¶ 50 Finally, UCMC's allegations of contributory negligence do not change the result at this juncture. Contributory negligence results from a lack of due care for one's safety and is measured by the objective standard of a reasonable person. *McCarthy v. Kunicki*, 355 Ill. App. 3d 957, 972 (2005). While UCMC argues that HJC drivers were not instructed to use a steel dolly to free a pallet jack, it does not follow that HJC drivers were explicitly told not to use a steel dolly in that manner. Additionally, Cahill admittedly used hindsight when he testified that Steven's manner of using the dolly was unsafe. More importantly, we review UCMC's motion for summary judgment in the light most favorable to Steven, not UCMC, and contributory negligence generally constitutes a question for the trier of fact (*Graham v. Northwestern Memorial Hospital*, 2012 IL App (1st) 102609, ¶ 19). Accordingly, Steven is entitled to a trial on his claims.

¶ 51                                                         III. CONCLUSION

¶ 52 Here, UCMC failed to demonstrate that it was entitled to judgment as a matter of law with respect to duty and proximate cause. Consequently, the circuit court improperly granted summary judgment in UCMC's favor, and we reverse and remand for further proceedings. In light of our determination, we need not consider Steven's remaining contentions.

¶ 53 Reversed and remanded.